1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT
9              WESTERN DISTRICT OF WASHINGTON
                        AT SEATTLE
10

11    CHEYANNE [DIXSON] ROSA,              CASE NO. 2:24-cv-01673-TL

12                 Plaintiff,              ORDER ON MOTION FOR
            v.                            SUMMARY JUDGMENT
13
      CITY OF ISSAQUAH, a municipal
14    corporation in and for the State of
      Washington,
15
                   Defendant.
16

17

18        This case arises out of Plaintiff's request for accommodation for her religious objections

19   to Defendant's COVID-19 vaccination mandate. The matter is before the Court on Defendant's

20   Motion for Summary Judgment (Dkt. No. 14). Having considered the motion, Plaintiff's

21   Response (Dkt. No. 24), Defendant's Reply (Dkt. No. 32), the relevant record, and having held

22   oral argument on August 28, 2025, the Court GRANTS Defendant's motion for summary

23   judgment.

24

1

## I.  BACKGROUND

The following facts either are not genuinely disputed or are taken in the light most favorable to Plaintiff, the non-moving party.

### A.  The COVID-19 Pandemic in Washington[1]

On January 20, 2020, Western Washington took center stage in an evolving national and international crisis as the site of North America's first known case of COVID-19, the disease caused by the novel coronavirus SARS-CoV-2.[2] Dkt. No. 16 (Lynch Decl.) at 4 ¶¶ 7–8. By the end of that month, both the World Health Organization and then-U.S. Health and Human Services Secretary Alex M. Azar II had officially declared the COVID-19 pandemic a public health emergency by the. *Id.* at 6 ¶ 10. In Washington and around the world, daily life quickly turned upside down. By March 2020, the virus's "rampant spread" had compelled federal, state, and local governments to take such "drastic actions" as "institut[ing] 'stay home' orders" and "implement[ing] widespread 'social distancing measures.'" *Pimentel-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1233 (W.D. Wash. 2020).

COVID-19 is an infectious disease that spreads easily from person to person through tiny droplets called *aerosols*, which are produced when a person exhales, coughs, sneezes, or talks and which can linger in indoor spaces like cigarette smoke. *Id.* at 4 ¶¶ 7–8, 29 ¶ 68. People who contract COVID-19 can spread the virus before they have symptoms. *Id.* at 4 ¶ 8. Some people never develop any symptoms (i.e., asymptomatic infection) but can still spread the virus, potentially without knowing that they were ever infected. *Id.* Individuals who do develop

---

[1] Much of the factual background in this subsection is provided by Defendant's expert, Dr. John Lynch. However, these are facts that Plaintiff either does not refute, or has not produced evidence to contradict. Plaintiff's own expert, Dr. Harvey Risch, has not provided a similar factual background about the COVID-19 pandemic, the symptoms of COVID-19, or the development of COVID-19 vaccines. *See generally* Dkt Nos. 27, 27-1, 27-2. Dr. Risch does not appear to refute the accuracy of any fact in this section, though at times he disputes their significance. *See* Dkt. No. 27-1 at 15–30.

[2] For simplicity, the Court refers in this order to both the SARS-CoV-2 virus and the disease it causes as "COVID-19."

1    symptoms may undergo a range of experiences, from mild or moderate symptoms, to severe

2    symptoms requiring hospitalization, to death. *Id.* Some patients who do recover from acute

3    COVID-19 infection are nonetheless left disabled by chronic illness colloquially referred to as

4    "long Covid." *Id.* at 5 ¶ 8. COVID-19 hospitalization in the United States peaked in January

5    2021, when 21 out of every 100,000 people in the country were in the hospital at one time. *Id.* at

6    7 ¶ 12. Certain populations were particularly hard hit by the pandemic and were more likely to

7    experience hospitalization and death from COVID-19. *Id.* These included people over 65,

8    communities of color, people with disabilities and medical conditions, and people experiencing

9    poverty, incarceration, or other systemic inequalities. *Id.* Some patients who do recover from

10   acute COVID-19 infection are left disabled by chronic illness colloquially referred to as "long

11   Covid." *Id.* at 5 ¶ 8.

12        The staggeringly aggressive spread of the virus and its grave human cost precipitated a

13   dramatic public health response. Scientists began working to develop vaccines against

14   COVID-19 in January 2020. *Id.* at 8 ¶ 14. There was a broad consensus in the public health

15   community that an effective vaccination would be the key to emerging from the deep disruption

16   caused by pre-vaccine mitigation measures such as lockdown orders. *Id.* at 7 ¶ 13. The first

17   vaccines were granted emergency-use authorization by the Food and Drug Administration

18   ("FDA") in December 2020. *Id.* at 8 ¶ 15. After promising results, the first of these was approved

19   by the FDA for adult use in August 2021. *Id.* at 10 ¶ 22, 12 ¶ 27. This was the Pfizer vaccine,

20   which had been shown in lab trials to prevent 95% of confirmed COVID-19 cases. *Id.* at 10 ¶ 22,

21   12 ¶ 27.

22        Although a vaccinated individual may still contract COVID-19 (experiencing what is

23   known as a "breakthrough infections"), vaccines are associated with a greatly reduced risk of

24   severe illness or death. *Id*. at 18 ¶ 43, 134 ¶ 34(b) (Lynch rebuttal). A May 2021 study of

healthcare workers in Israel showed not only that the infection rate was much lower among those who were vaccinated, but also that most vaccinated people who became infected were asymptomatic, while most unvaccinated people who became infected developed symptoms. *Id.* at 33 ¶ 76. Breakthrough infections in vaccinated people are also less likely to be passed along to others than infections in unvaccinated people. *Id.* at 134 ¶ 34(b). Vaccination was able not only to save lives, but to slow the spread of infection, protect vulnerable populations, and reduce strain on healthcare systems over-taxed by COVID-19 hospitalizations. *Id.* at 14 ¶ 33.

After the COVID-19 virus was first discovered in December 2019, it continued to evolve into new and more contagious variants. In the summer of 2021, the so-called Delta variant of COVID-19 ("Delta") was surging in Washington and elsewhere in the United States. *Id.* at 25 ¶ 61. Delta was more than twice as contagious as earlier variants. *Id.* at 26 ¶ 62. Data at the time also showed that Delta caused longer infections and more serious illness than previous variants. *Id.* at 26 ¶ 63. As of July 30, 2021, the Washington Department of Health estimated that 1 in 172 Washingtonians had an active COVID-19 infection. *Id.* at 25 ¶ 62. One week later, that proportion had increased to 1 in 156. *Id.* COVID-19 hospitalizations in the state were at an all-time high that summer and fall, and 95% of hospitalized patients were unvaccinated. *Id.* Vaccines available at the time showed efficacy against the Delta variant slightly below 90%. *Id.* at 26 ¶ 62. King County data from late 2021 showed that unvaccinated individuals were 4.5 times more likely than fully vaccinated individuals to test positive for COVID-19, 32 times more likely to be hospitalized, and 40 times more likely to die. *Id.* at 25 ¶ 62.

On August 9, 2021, Washington Governor Jay Inslee issued the first version of a proclamation that would prohibit most state employees and Washington healthcare workers from working after October 18, 2021, without being fully vaccinated against COVID-19. *See* Dkt. No. 15 (Johnson Decl. and exhibits) at 9–17 (Proclamation 21-14); Dkt. No. 16 at 24 ¶ 58.

1    County and city governments quickly followed suit, establishing vaccination requirements for

2    their employees. Dkt. No. 16 at 24 ¶¶ 59–60. By that time, vaccines had been shown to be safe

3    and highly effective at preventing severe illness caused by COVID-19, and they remained so

4    against the highly infectious Omicron variant that was surging by the end of 2021. *Id.* at 27–28

5    ¶¶ 65–66. While other mitigation measures were also part of the public health response, it was

6    not known at the time which of these (other than isolation) was most effective, or how much

7    protection they provided. *Id.* at 28 ¶ 671, 121 ¶ 5 (Lynch rebuttal).

8        **B. Defendant's Vaccine Mandate**

9        In August 2021, the City of Issaquah ("City" or "Defendant"), announced that it would

10    "require mandatory vaccination for most employees beginning October 1, 2021." Dkt. No. 15 at

11    23 (Administrative Order). The policy was later clarified to apply to "all City employees," and

12    the vaccination deadline was extended to October 18, 2021. Dkt. No. 15 at 45 (October 15, 2021,

13    human resources letter to Plaintiff). The announcement urged that "vaccination is one of the

14    most important tools to end the pandemic" (Dkt. No. 15 at 23) but also detailed many other

15    COVID-19-related policies adopted by the City, including mandatory indoor masking[3] (*id.* at

16    24); rules for occupancy, distancing, and ventilation in City vehicles (*id.* at 26); and protocols for

17    employees who were exposed to COVID-19 or who contracted the virus (*id.*). With regard to the

18    vaccination policy only, the order informed employees that exemptions would be considered for

19    employees "with a medical or religious reason for not vaccinating." *Id.* at 23.

20    //

21    //

22    //

23

24    _____

[3] Defendant variously required or encouraged masking by all employees and various times during the pandemic.
Dkt. No. 26 at 12; *see* Dkt. No. 15 at 74 (Bobkiewicz–All City emails).

ORDER ON MOTION FOR SUMMARY JUDGMENT – 5

### C.  Plaintiff's Employment with the Issaquah Police Department

Plaintiff Cheyanne Rosa (then Cheyanne Dixson)[4] was an Issaquah City employee who requested, and was granted, a religious exemption to the vaccine mandate. Dkt. No. 26 (Rosa Decl.) at 4–5; Dkt. No. 15 at 3 ¶ 13. Plaintiff worked as a police officer for the Issaquah Police Department ("IPD") and had been employed in that role since February 16, 2017. Dkt. No. 26 at 1–2. Plaintiff's duties as a police officer required her to work in person with others, interacting regularly with coworkers and members of the public. On a normal day, she would begin her shift with a squad meeting, followed by patrol. Dkt. No. 18 (Schwan Decl. and exhibits) at 2 ¶ 6. Patrol consisted of walking or driving through her assigned areas to aid in preventing crime and enforcing laws. *Id.* at 2 ¶ 5; Dkt. No. 18 at 5 (Police Officer job description). IPD appears to have followed a solo patrol model at this time, meaning that Plaintiff was alone while in her patrol vehicle when not transporting detainees, victims, or other community members. *See* Dkt. No. 24 at 10.[5] During patrol, however, Plaintiff had daily, direct contact with the public which could include responding to the scene of a crime or accident, administering first aid, interviewing victims and eyewitnesses, physically detaining people, and transporting detainees and others in her patrol vehicle. Dkt. No. 18 at 5–8 (Police Officer job description); Dkt. No. 26 at 12; Dkt. No. 17 at 12–17 (Rosa Dep.); Dkt. No. 17 at 101–102 (Johnson Dep.).

Plaintiff testified that her job also included work within Issaquah City Jail, accompanying detainees during booking, and sometimes filling in to support correctional officers when

---

[4] Although this matter was filed as *Rosa v. City of Issaquah,* both parties consistently refer to Plaintiff as "Dixson" or "Ms. Dixson" in their summary judgment briefing. *See generally* Dkt. Nos. 14, 24, 32. Plaintiff's declaration (Dkt. No. 26) bears both surnames, and the transcript of her deposition testimony (Dkt. No. 17 at 3–31) uses only "Rosa." For simplicity, the Court will refer to Plaintiff as "Plaintiff"; however, both "Rosa" and "Dixson" appear in this Order within quotes and document names, and both refer to Plaintiff.

[5] Plaintiff asserts in response that Defendant "is a solo patrol unit PD meaning officers ride in their cars alone," but the deposition testimony Plaintiff cites in support of this statement was not provided to the Court. Dkt. No. 24 at 10. However, this assertion is consistent with other evidence in the record. *See, e.g.*, Dkt. No. 26 at 6–7 (recounting an on-duty incident and implying that Plaintiff and another officer were each alone in their respective patrol vehicles); Dkt. No. 17 at 66 (Johnson 30(b)(6) Dep.) (testifying that Plaintiff was not required to mask while alone in her patrol vehicle, but only if transporting someone).

1  understaffed. Dkt. No. 17 at 7, 17, 19. Most of the people incarcerated in Issaquah City Jail at

2  that time, according to Plaintiff, were also experiencing homelessness, mental illness, or

3  addiction. *Id.* at 13. While not on patrol, Plaintiff worked in close proximity to other City

4  employees at the police station, where she would consult with detectives; write reports on shared

5  computers; and use the communal locker room, gym, and restrooms. Dkt. No. 18 at 2 ¶ 4, 10–29

6  (photos of workspace).

7      Plaintiff saw her work in law enforcement as a calling and felt a profound camaraderie

8  with her coworkers. Dkt. No. 26 at 2, 5. After she and other IPD officers that responded to a

9  hostage situation in February 2020, Plaintiff took a special interest in hostage negotiations. *Id.* at

10  5. She completed two levels of training on the subject and developed a detailed proposal for the

11  formation of a hostage negotiation team within the IPD, which she formally presented to the

12  Chief and Commander of the Department. *Id.*

13      During Plaintiff's time with the IPD, she was involved in multiple arrests where a

14  suspect's violent actions placed her life at risk. Dkt. No. 26 at 2, 6, 8. One of these incidents led

15  to a diagnosis of Post-Traumatic Stress Disorder. *Id.* at 7.

16      In addition to being a dedicated officer, Plaintiff also describes herself as a dedicated

17  Christian. *Id.* at 3. Her faith helped her process and heal from childhood trauma, including severe

18  physical abuse by her father, and she also sought out Christian counseling to help her cope with

19  the trauma she experienced in the line of duty. *Id.* at 3, 7. Plaintiff avers that her particular

20  religious beliefs were staunchly in opposition to her receiving the COVID-19 vaccine. *Id.* at 4.

21  Plaintiff believes that the vaccine was developed using technologies involving abortion, which

22  she opposes, and that receiving the COVID-19 vaccine would "corrupt [her] blood." *Id.* Plaintiff

23  believes that she has "god given natural immunity" that protects her from COVID-19 infection.

24  *Id.* at 12.

ORDER ON MOTION FOR SUMMARY JUDGMENT – 7

### D. Plaintiff's Religious Exemption and Denial of Accommodations

When the City of Issaquah announced its vaccine requirement, Plaintiff submitted a formal request for an exemption and accommodation, informing Defendant that her sincerely held religious belief prevented her from becoming vaccinated because: (1) vaccination would betray her faith in God as her ultimate healer, (2) the vaccine would corrupt her blood with unnatural components not created by God, and (3) she objected on religious grounds to the use of aborted fetal tissue in the manufacture or development of the COVID-19 vaccine. Dkt. No. 15 at 33–35 (Religious Accommodation Request Form).

On October 1, 2021, the City informed Plaintiff that it was granting her exemption request, but that it would need more time to evaluate whether an accommodation could be offered. Dkt. No. 15 at 40 (October 1, 2021, human resources letter to Plaintiff). The letter continued, "accommodation requests are properly granted unless they are unreasonable, impose an undue hardship, or involve a direct threat to health and safety. The analysis focuses on an employee's duties and responsibilities, and whether the risk posed by or to an unvaccinated employee can be eliminated or sufficiently mitigated." On October 15, 2021, Plaintiff received a letter from the City's Director of Human Resources, Stephanie Johnson. Dkt. No. 15 at 45-46. The letter informed Plaintiff that, although "the City accepted that [her] religious exemption was based on a sincerely held religious belief," the City "ha[d] concluded that it c[ould] not reasonably accommodate [Plaintiff] without posing an undue hardship on the City." *Id.* at 45. The City informed Plaintiff it had reached this determination by "considering the daily direct contact [Plaintiff had] with the public, the contact [she had] with other employees, developments in the virus that have made it more contagious and easier to transmit, the ongoing costs of testing (both in terms of cost of tests and in terms of work time and efficiency costs), and in consideration of the City's plan to begin reopening offices" on a rolling basis. *Id.* at 46.

1    Although the vaccination deadline had previously been set at October 18, 2021, the letter

2    informed Plaintiff of a "limited extension of time through December 15, 2021 . . . in order to

3    give you additional time to vaccinate, recognizing that you are receiving this letter very close to

4    the implementation date of the City's vaccine mandate." *Id.* at 46. The same extension was given

5    to other City employees who had requested a religious exemption from the vaccine policy. Dkt.

6    No. 25-1 (Schwan Dep.) at 29. The letter observed that the extension would also "provide[] the

7    City additional time to bargain" with Plaintiff's union, the Issaquah Police Officers Association

8    ("IPOA"), about the impacts of the policy. Dkt. No. 15 at 46. Beyond December 15, 2021,

9    however, Defendant would "not [be] able to grant an accommodation because such an

10   accommodation would pose an undue hardship." *Id.* "If you wish to remain employed beyond

11   December 15, 2021," Plaintiff was told, "you must be fully vaccinated." *Id.*

12       For the remaining months of Plaintiff's employment, she remained unvaccinated but was

13   "required to: continue testing two times per week for COVID-19, at the beginning of the

14   employee's workweek and in the middle of the employee's workweek, continue to wear an N95

15   mask at all times while performing work for the City, in City facilities, or on City property, and

16   continue to eat meals in the employee's own vehicle, outside (in which case the employee may

17   be unmasked on City property), or off site." Dkt. No. 15 at 49 (City–IPOA Memorandum of

18   Understanding). Testing required a 20-minute appointment between Plaintiff and her supervisor,

19   Sergeant Dustin Huberdeau, twice a week. *See* Dkt. No. 17 at 85 (Knox Dep.); Dkt. No. 26 at 11;

20   Dkt. No. 25-5 (Huberdeau Dep.) at 12–13. These tests occurred at the beginning of Plaintiff's

21   shift on paid work time. Dkt. No. 15 at 4 ¶ 14; Dkt. No. 26 at 11. at During these appointments,

22   Huberdeau was able to address other tasks while Plaintiff sat in her patrol vehicle awaiting the

23   result of her self-administered tests. Dkt. No. 25-5 at 4–5; Dkt. No. 26 at 11. Plaintiff did not

24   work during this time. Dkt. No. 17 at 30 (Rosa Dep.). The testing also delayed the start of the

pre-shift daily briefing for Plaintiff's squad on the days when Plaintiff tested. *See* Dkt. No. 17 at 85; Dkt. No. 18 at 2 ¶ 6. After Plaintiff reported her test results to Huberdeau, either in person or via text, she re-joined her squad for her shift. Dkt. No. 26 at 11. Plaintiff reports that she never tested positive for COVID-19. *Id.*

During her period of temporary accommodation, Plaintiff "interacted with employees and the public on a regular basis" and performed all her normal duties, including "investigating crimes, detaining people, and going to hospitals to do follow-ups or stay with the incarcerated inmates for health concerns." *Id.* at 12. Plaintiff testifies that some of the community members she transported during this time were infected with COVID-19. *Id.* To Plaintiff's knowledge, however, she did not become infected herself. *Id.* Plaintiff also worked extensive overtime during this period, as was required of all IPD officers at the time due to a staffing shortage. *Id.* at 11.

Plaintiff's expected termination date was extended by two months when, on November 10, 2021, the City reached an agreement with IPOA to extend Plaintiff's employment (and temporary accommodation) until February 16, 2022. If not fully vaccinated by that date, Plaintiff would be "separated from City employment" without challenge by IPOA "for failure to vaccinate" Dkt. No. 15 at 49. This Memorandum of Understanding ("MOU") indicates that Plaintiff was the only unvaccinated police officer in IPD at this time. *Id.* The record reflects several reasons as to why Defendant agreed to defer Plaintiff's termination and accommodate her temporarily. At least one consideration, reflected in the MOU, was a "staffing crisis in the Police Department," meaning that "Officer staffing over the November and December holidays [wa]s currently at critical levels." *Id.* at 48. The extension also allowed Plaintiff to complete her fifth year of employment as an officer with IPD, thus vesting her retirement benefits. Dkt. No. 15 at 4 ¶ 15; Dkt. No. 17 at 87–88 (Knox Dep.). The terms of the agreement reached with the IPOA also

allowed Defendant to avoid a grievance by Plaintiff's union and potential arbitration. Dkt. No. 15 at 49; Dkt. No. 17 at 87–88. No evidence has been presented that Defendant ever indicated that it would accommodate Plaintiff indefinitely or that Defendant ever expressed that it did not consider her accommodation to involve risk. Stephanie Johnson, Defendant's director of human resources, testified, "Although the City was concerned about the risks of retaining an unvaccinated police officer, especially as the Omicron waves began, it agreed to accept the additional risk and costs of accommodating Plaintiff for a temporary period. However, the City was not willing to accept the risks and costs indefinitely." Dkt. No. 15 at 4 ¶ 15.

Several other City employees also declined to become vaccinated on religious grounds and were granted exemptions. *See* Dkt. No. 17 (Phillips Dec. and exhibits) at 99 (Johnson Dep.) (discussing "21 individuals" who has requested vaccine exemptions or accommodations of some kind); Dkt. No. 15 at 80 (Bobkiewicz–All City emails) (October 2, 2021, email informing City staff that Defendant had granted religious exemptions to 11 employees); *id.* at 81 (October 18, 2021, email reporting that eight full-time employees with religious objections were being accommodated until December 15); Dkt. No. 17 at 87 (Knox Dep.) (recalling that 10 to 15 employees were receiving temporary accommodations including testing in late 2021). After considering each employee's duties, the city found that all positions filled by people with religious exemptions involved contact with the public, and none of them could be accommodated without undue hardship. Dkt. No. 17 at 99. Other than to Plaintiff, Defendant did not grant an additional extension past December 15, 2022, to any employee whose accommodation it denied. Dkt. No. 15 at 4 ¶ 15.

//

//

//

Plaintiff received a Notice of Intent to Separate on February 2, 2022, in which she was informed that she could request a *Loudermill* hearing.[6] Dkt. No. 15 at 5 ¶ 18; *see* Dkt. No. 15 at 58–60. The hearing was held on February 11, 2022. Dkt. No. 15 at 68 (Feb. 15, 2022, letter Re: Separation of Employment). At the expiration of the extension negotiated by IPOA, Plaintiff was not fully vaccinated. Dkt. No. 15 at 5 ¶ 18. Plaintiff was separated from the City effective February 15, 2022. *Id.* at 5 ¶ 20. Her termination was "[n]on disciplinary" and her separation was "in good standing." Dkt. No. 18 at 37 (Notice of Officer Separation). The official reason for Plaintiff's separation was that she was not vaccinated against COVID-19, and the "City of Issaquah requires all employees to be vaccinated." *Id.*

### E.  Procedural History

On December 15, 2022, Plaintiff filed a complaint in this District against "the City of Issaquah Police Department, Mayor Mary Lou Pauly, City Administrator Wally Bobkiewicz, and DOES 1-25." *Dixson v. Issaquah Police Dep't*, No. C22-1771, 2024 WL 97327, at *1 (W.D. Wash. Jan. 9, 2024). The individual named defendants were subsequently dismissed. *Id.* at *1. That case ended with summary judgment granted for the IPD under prevailing Washington case law holding that "a police department is not a legal entity with the capacity to be sued." *Id.* at *2 (collecting cases).

---

[6] "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotation omitted). "To meet this requirement, the state must provide pre-termination notice with an explanation of its evidence, and an opportunity for the employee facing discharge to respond, either orally or in writing." *Caraway v. Town of Columbus*, 765 F. App'x 374 (9th Cir. 2019) Where a state or city employee is given a chance to respond orally before a termination, this is referred to as a "*Loudermill*" hearing of meeting. *Marable v. Nitchman*, 511 F.3d 924, 927 (9th Cir. 2007). In the COVID-19 context, the Ninth Circuit and numerous district courts have held that *Loudermill* hearings may not always be required. *See, e.g.*, *Bacon v. Woodward*, No. 22-35611, 2024 WL 3041850, at *2 (9th Cir. June 18, 2024) ("[W]ith respect to a categorical challenge to the substance of a generally applicable law impacting property rights—such as 'continued employment in a state job'— we have held that no procedural due process is required beyond the proper promulgation of the new substantive rule." (citing *Rea v. Matteucci*, 121 F.3d 483, 484–85 (9th Cir. 1997))); *Pilz v. Inslee*, C21-5735, 2022 WL 1719172, at *7 (W.D. Wash. May 27, 2022), *aff'd*, No. 22-35508, 2023 WL 8866565 (9th Cir. Dec. 22, 2023); *Gray v. Washington State Dep't of Transp.*, No. C23-5418, 2023 WL 6622232, at *5 (W.D. Wash. Oct. 11, 2023), *aff'd sub nom. Gray v. Washington Dep't of Transp.*, No. 23-3278, 2024 WL 5001484 (9th Cir. Dec. 6, 2024), *cert. denied* 145 S. Ct. 2780 (2025).

On August 26, 2024, Plaintiff filed the instant case against the City of Issaquah and several individual defendants (later dismissed, *see* Dkt. No. 13) in King County Superior Court. *See* Dkt. No. 1-2 (Complaint). Defendant subsequently removed the case to this Court. Dkt. No. 1 (Notice of Removal). Plaintiff seeks damages and declaratory relief, and asserts four causes of action: (1) failure to accommodate her sincere religious belief in violation of Washington's Law Against Discrimination ("WLAD"), Chapter 49.60 RCW; (2) violation of civil service rules under Chapter 41.12 RCW and the City of Issaquah's Civil Service Rules and Regulations; (3) violation of Plaintiff's First Amendment right to freely exercise her religion, a claim brought under 42 U.S.C. § 1983; and (4) wrongful discharge in violation of public policy, a state-law tort. Dkt. No. 1-2 ¶¶ 68–116.

In response to Plaintiff's WLAD claim, Defendant has asserted, as an affirmative defense, that accommodating Plaintiff would have imposed an undue hardship on Defendant. Dkt. No. 4 (answer to complaint) at 11 ¶ 71, 19 ¶ 2. Related to its undue hardship defense, Defendant offers expert opinions and testimony from Dr. John D. Lynch. *See* Dkt No. 16 (Lynch Decl.); Dkt. No. 21-1 (Lynch Report); Dkt. No. 16 at 119–64 (Lynch Rebuttal). In rebuttal, Plaintiff offers expert opinions and testimony by Dr. Harvey Risch. Dkt No. 27 (Risch Decl.); Dkt. No. 27-1 (Risch Report); Dkt. No. 27-2 (Risch Addendum).

At the close of discovery, on May 23, 2025, Defendant moved for summary judgment on all four claims. Dkt. No. 14. Each party concurrently moved to exclude the other party's expert. Dkt. No. 19 (Defendant's Motion to Exclude Dr. Risch); Dkt. No. 20 (Plaintiff's Motion to Exclude Dr. Lynch). The Court denied Plaintiff's motion to exclude Dr. Lynch. Dkt. No. 43. The opinions of Dr. Risch are discussed below. *See infra* Section III.C.1.b.(2)(i).

//

//

1

## II. LEGAL STANDARD

2      Summary judgment is appropriate where "the movant shows that there is no genuine

3  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

4  Civ. P. 56(a). At this stage, the Court does not make credibility determinations, nor does it weigh

5  the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Munden v. Stewart*

6  *Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021). The inquiry turns on "whether the evidence

7  presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

8  that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. A genuine triable

9  issue of material fact exists where "the evidence is such that a reasonable jury could return a

10  verdict for the nonmoving party." *Id.* at 248; *see also McSherry v. City of Long Beach*, 584 F.3d

11  1129, 1135 (9th Cir. 2009) (explaining that this is the inquiry at the summary judgment stage,

12  "[s]tripped to its core"). Additionally, "all justifiable inferences" must be drawn in the

13  non-movant's favor, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S.

14  144, 158–59 (1970)), "only in the sense that, where the facts specifically averred by [the non-

15  moving] party contradict facts specifically averred by the movant, the [summary judgment]

16  motion must be denied," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

17      Under Federal Rule of Civil Procedure 56, to establish that a fact cannot be genuinely

18  disputed, the movant can either cite the record or show "that the materials cited do not establish

19  the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible

20  evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the movant has made such a

21  showing, "its opponent must do more than simply show that there is some metaphysical doubt as

22  to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

23  (1986) (internal citation omitted); *see also Anderson*, 477 U.S. at 252 (specifying that the non-

24  movant must show more than the "mere existence of a scintilla of evidence"); *accord In re*

1    *Oracle Corp. Secs. Litig.,* 627 F.3d 376, 387 (9th Cir. 2010). The non-movant "bears the burden

2    of production under Rule 56 to 'designate specific facts showing that there is a genuine issue for

3    trial.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

4    317, 324 (1986)). The Court will enter summary judgment "against a party who fails to make a

5    showing sufficient to establish the existence of an element essential to that party's case, and on

6    which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (1986); see also

7    *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798, 805 (9th Cir. 2010) (affirming

8    grant of summary judgment against appellant who had "failed to adduce any evidence or

9    authority to support her claim"), *cert. denied*, 563 U.S. 1008 (2011).

**III.    DISCUSSION**

**A.    Defendant's Motion to Strike**

10

11

12    As a preliminary matter, in its reply in support of summary judgment, Defendant moves

13    to strike several "inadmissible and unsupported factual assertions" contained in Plaintiff's reply

14    and accompanying declaration. Dkt. No. 32 at 3. The Court addresses these in turn.

15    First, Defendant raises concerns about opinions stated by Plaintiff that she has never

16    contracted or transmitted COVID-19 and was "safe" in the workplace because Plaintiff "lacks

17    the medical/scientific expertise to opine on" these topics. *Id.* The Court agrees that Plaintiff does

18    not have the expertise to offer opinions on whether her precautions rendered her "safe" and notes

19    further that she cannot know with certainty that she has never had at least an asymptomatic

20    COVID-19 infection. Although the Court does not strike Plaintiff's statements, it considers them

21    only to the extent that they illustrate Plaintiff's subjective beliefs about her susceptibility to

22    COVID-19.

23    Defendant also objects to "Dixson's counsel's unsupported assertions and

24    misrepresentations of cited deposition testimony," citing several examples. *Id.* The Court does

not take these concerns lightly and has itself noted several other misleading paraphrases of

deposition testimony, as noted below and in the Court's recent order on Plaintiff's motion to

exclude Defendant's expert. *See infra* n.11; Dkt. No. 43 at 19–20 & n.9.[7] In considering the

briefing on this motion, the Court has been conscientious in verifying citations—from both

Parties—and has disregarded assertions that are unsupported by the record. *See Hernandez v.*

*Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (where Defendant "has carried its

burden of production," Plaintiff "cannot defeat summary judgment with allegations in the

complaint, or with unsupported conjecture or conclusory statements.")

### B.    Plaintiff's Motion to Strike

On September 4, 2025, Defendant filed a Notice of Supplemental Authority with the

following text:

> Defendant respectfully notifies the Court, pursuant to LCR 7(n), of
> the recent decision in: *Petersen v Snohomish Reg'l Fire & Rescue*,
> No. 24-1044 (9th Cir. Sept. 2, 2025), attached hereto as Exhibit A.

---

[7] The Court further notes here, as it did at oral argument, that its consideration of the motions before it in this matter has been complicated and significantly protracted by an unjustifiable amount (across all recent filings on Plaintiff's behalf) of typographical errors, nonstandard and inconsistent citation formats, and citations to pages of exhibits that were not actually presented to the Court. This is all in addition to misleading paraphrases of deposition testimony. While the Court appreciates the effort made by Plaintiff's counsel in re-filing its summary judgment response and exhibits with some corrections, such attempt at remediation is too little, too late. *See* Dkt. Nos. 42–42-5. While some errors were indeed corrected, others were not, and still new errors were introduced into the "corrected" motion that were not there before. For example, on one page, square brackets that previously enclosed the second half of a record citation have been replaced with parentheses, but these still enclose only part of the citation. *See* Dkt. No. 43 at 23. As with three other pairs of parentheses *on the same page*, the closing parenthesis is italicized but the opening parenthesis is not. *Id.* Equally inexplicable, the second half of a case law citation (including the reporter but not the case name) is now in parentheses, and one "*id.*"—but not others—has become "*ibid.*" *Id.* Other changes, while not obviously wrong, highlight just how error-ridden counsel's original filing was: Three citations to the record have been replaced with different exhibits or pages, and a date in December 2021 was replaced with a date in February 2022. *Id. This is all on a single page.* As for the attached exhibits, some previously missing pages have been added (e.g., Huberdeau Dep. 16, now 42-3 at 13), while other pages cited by Plaintiff have not (e.g. Huberdeau Dep. 23, 24, 25, 32). Moreover, these documents were not filed with a praecipe, as required by Local Civil Rule 7(m), that "specif[ies] by docket number the document being corrected and the corrections by page and line number" and "set[s] forth why" any previously missing document "was not included." For all these reasons, the Court has not considered the majority of these late-filed documents. The one document the Court does consider is Docket No. 42-4, which includes deposition excerpts from Plaintiff's expert Dr. Harvey Risch. Before this filing, nearly all of the pages that should have been included in "Exhibit G" to the Declaration of Tracy Tribbett (Dkt. No. 25-7) were missing. The Court has considered the recently filed excerpts of Dr. Risch's deposition to the extent necessary to verify any statement of Dr. Risch's that was relied on both by Plaintiff in her response and by the Court in preparing this Order.

This decision addresses issues related to Plaintiff's failure to accommodate claim, which is the subject of Defendant's pending Motion for Summary Judgment (Dkt. 14).

Dkt. No. 40. The *Petersen* decision was attached without further remark.

On September 5, 2025, Plaintiff filed an "Objection and Request to Strike Defendant's Notice of Supplemental Authority / Plaintiff's Response." Dkt. No. 41. In the Objection and Request to Strike, Plaintiff makes several arguments distinguishing the facts underlying her claims from the facts in *Petersen* and moves to strike Defendant's Notice of Supplemental Authority "on the grounds that it violates *Nichols v. Harris*, 17 F. Supp. 3d 989, 996 n.3 (C.D. Cal. 2014), by arguing that the cases are factually similar and stating how they are allegedly similar. Defendant's statement is demonstrably false. The cases are not remotely similar."

The Court denies Plaintiff's request to strike and finds that it is frivolous. First, Defendant's notice of supplemental authority, which contains no argument, is clearly proper under LCR 7(n), which allows a party to "bring to the court's attention relevant authority issued after the date the party's last brief was filed by serving and filing a Notice of Supplemental Authority that attaches the supplemental authority without argument." Merely pointing out which issue the case addressed is not remotely "arguing that the cases are factually similar and stating how they are allegedly similar," as Plaintiff alleges.[8] Second, Defendant's filing—though not Plaintiff's—is fully consistent with the *Nichols* court's observation that "filing a Notice of Supplemental Authority with a copy of or a citation to a recently published case is proper; including a memorandum with the Notice . . . is not." 17 F. Supp. 3d at 996 n.3. Third, it is not possible for Defendant's filing to "violat[e]" *Nichols*, as Defendant's filings are not governed by a district court's summary judgment order from another district, persuasive though its reasoning

---

[8] Indeed, it is Plaintiff who includes argument in her objection—contrary to LCR 7(n)—about how the cases are not factually similar. Dkt. No. 41 at 2-3.

might be.[9] Fourth and finally, *Petersen* is an intervening Ninth Circuit opinion addressing a

claim brought under the WLAD by plaintiffs who alleged their employer failed to accommodate

their religious objections to a COVID-19 vaccine mandate. The Court is not only permitted but

*required* to consider this binding authority. Regardless of factual differences which may or may

not distinguish *Petersen* from Plaintiff's case—which the Court must also consider—there is no

non-frivolous basis for asserting that *Petersen* as is not "relevant authority" under LCR 7(n), or

that any statement in the Notice of Supplemental Authority "is demonstrably false." *See* Fed. R.

Civ. P. 11(b)(2) ("By presenting to the court a pleading, written motion, or other paper . . . an

attorney or unrepresented party certifies that to the best of the person's knowledge, information,

and belief, formed after an inquiry reasonable under the circumstances: the . . . legal contentions

are warranted.")

Because the local rules prohibit a party submitting a Notice of Supplemental Authority

from presenting argument as to the relevance of such authority, and Defendant has properly

refrained from offering argument (but Plaintiff did not in her objection), the Court does not

consider the arguments Plaintiff improperly submitted in her Objection and Request to Strike.

### C.    Defendant's Motion for Summary Judgment

Plaintiff asserts four causes of action: (1) a religious discrimination claim under

Washington's Law Against Discrimination (WLAD), Chapter 49.60 RCW 49.60, for failure to

accommodate her sincerely held religious belief; (2) a claim that Defendant violated state and

local civil-service rules; (3) a First Amendment—free exercise claim (brought under 42 U.S.C.

---

[9] It is frankly perplexing that Plaintiff felt the need to rely on *Nichols* at all, especially since the citation relied on from the case does not add anything that is not already contained in LCR 7(n)—which is the relevant rule and which Plaintiff was made aware of by Defendant's Notice of Supplemental Authority. Further, Plaintiff chose to rely on a case that was vacated by the Court of Appeals in 2022. *See Nichols v. Newsom*, No. 14-55873, 2022 WL 4295404, at *1 (9th Cir. Sept. 12, 2022).

1    § 1983); and (4) a tort claim for wrongful discharge in violation of public policy, citing RCW

2    49.60.030(1) and 49.60.180(2). Defendant moves for summary judgment on all four claims.

3                    **1.    Claim One: Failure to Accommodate under WLAD**

4          The WLAD creates a cause of action against employers who fail to reasonably

5    accommodate an employee's religious practices. *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481,

6    500–01, 325 P.3d 193 (2014). The elements of such a claim are substantially the same as the

7    elements of a failure-to-accommodate claim under Title VII of the Civil Rights Act of 1964, and

8    case law interpreting the requirements of Title VII case law applies with equal force to cases

9    under the WLAD. *See id.*, 501–02. To allege a prima facie case of failure to accommodate

10   religious practices, an employee must show that: (1) the plaintiff had a bona fide religious belief,

11   the practice of which conflicted with employment duties; (2) the plaintiff informed the employer

12   of the beliefs and the conflict; and (3) the employer discharged, threatened, or otherwise

13   subjected her to an adverse employment action because of her inability to fulfill the job

14   requirement. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004).

15         Once a plaintiff has alleged a prima facie case of religious discrimination, the burden

16   shifts to the employer to show "that it initiated good faith efforts to accommodate the employee's

17   religious practices or that it could not reasonably accommodate the employee without undue

18   hardship." *Lawson v. Washington*, 296 F.3d 799, 804 (9th Cir. 2002) (quoting *Heller v. EBB

19   Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)). "[U]ndue hardship is shown when a burden is

20   substantial in the overall context of an employer's business." *Suarez v. State*, 3 Wn.3d 404, 423,

21   552 P.3d 786 (2024) (quoting *Groff v. DeJoy*, 600 U.S. 447, 468 (2024)).

22                        **a.    Prima Facie Case**

23         While the burden to establish a prima facie case is "not onerous," *Lyons v. England*, 307

24   F.3d 1092, 1112 (9th Cir. 2002), a plaintiff must still produce *some* evidence to meet her burden,

*see id.* at 1113. Here, Plaintiff has presented evidence in the form of her sworn declaration that she holds sincere religious beliefs that prevent her from becoming vaccinated against COVID-19. Dkt. No. 26 at 4. Defendant did not challenge the sincerity of Plaintiff's alleged religious belief when she applied for an exemption (Dkt. No. 15 at 40) and, for the purposes of this motion, does not contest that Plaintiff has met her burden of production on this element (Dkt. No. 14 at 12). The remaining elements of Plaintiff's prima facie are supported by the factual record, *see supra* Section I.D., and appear to be uncontested for all purposes. *Compare* Dkt. No. at 7–10, *with* Dkt. No. 24 at 13–14. Defendant made COVID-19 vaccination an employment requirement. Plaintiff submitted a request for a religious exemption in which she informed her employer that her religious beliefs conflicted with this requirement. Ultimately, Plaintiff was terminated from her job because she did not become vaccinated. Therefore, the Court finds that Plaintiff has put forward evidence to support each element of a prima facie case of religious discrimination under the WLAD on a failure-to-accommodate theory.

### b.    Undue Hardship

Defendant argues that Plaintiff's failure-to-accommodate claim under the WLAD fails because exempting Plaintiff from COVID-19 vaccination and allowing her to continue to work as a police officer while unvaccinated would have imposed an undue hardship on Defendant in the operation of its business. Dkt. No. 14 at 15–21; *see Groff*, 600 U.S. at 470; *Suarez*, 3 Wn.3d at 408. "[U]ndue hardship is a complete defense to [a] failure-to-accommodate claim[s]." *White v. Univ. of Wash.,* No. C22-1798, 2024 WL 1241063, at *6 (W.D. Wash. Mar. 22, 2024) (citing *Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674, 2024 WL 278973, at *6 (W.D. Wash. Jan. 25, 2024)). An employer establishes undue hardship if an accommodation would result in "substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470. However, "costs" that courts consider are not limited to financial expenditures

but also include non-monetary impacts such as an "accommodation's effect on co-workers" that "may have ramifications for the conduct of the employer's business," *id.* at 472, as well as any "cost to an employer's mission," *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1151 (D. Or. 2024). "An accommodation that creates unreasonable safety risks, regardless of economic costs, also presents an 'undue hardship' for an employer." *Suarez*, 3 Wn.3d at 427; *see also Lavelle-Hayden*, 744 F. Supp. 3d at 1151. Therefore, an "analysis of an 'undue hardship' defense is not simply a financial or monetary loss calculation." *Suarez*, 3 Wn.3d at 427; *see also Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1134 (C.D. Cal. 2023) ("Non-economic impacts on coworkers can be considered, so long as those impacts are not the result of employee animosity to a particular religion, to religion in general, or the notion of accommodating religious practice."), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025).

The Supreme Court has instructed district courts to "apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Groff*, 600 U.S. at 470–71 (citation modified). A district court considering an undue hardship defense is further instructed to "resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.* at 471. Finally, "[c]ourts within the Ninth Circuit recognize that 'it is appropriate to confine the [undue hardship] analysis to the information available to the employer when it made its undue hardship decision.'" *Efimoff v. Port of Seattle*, No. C23-1307, 2024 WL 4765161, at *9 (W.D. Wash. Nov. 13, 2024) (collecting cases).

### (1)    Defendant Establishes Undue Hardship

Defendant contends that accommodating Plaintiff by allowing her to work as a police officer while unvaccinated, even with her other accommodations of masking, biweekly testing,

and outdoor meals in place, would have imposed a significant hardship on the operation of its

business, and has presented voluminous evidence in support of its claims. Following the

approach taken by the Ninth Circuit in its recent decision in *Petersen*, 2025 WL 2503128, at

*5–8, the Court will separately consider the health and safety costs, operational burdens, and

financial costs Defendant asserts, and the evidence that supports Defendant's claims.

(i)    **Health and Safety Costs**

In the COVID-19 context, "[n]umerous courts have found the possibility of an

unvaccinated individual getting others sick to be a non-speculative risk that a court may consider

when performing an undue hardship analysis." *Bordeaux*, 703 F. Supp. 3d at 1136 (collecting

cases). This approach was recently affirmed by the Ninth Circuit when considering the similar

context of religious accommodations for unvaccinated firefighters:

> *Groff* tells us that we may look to EEOC guidance to help
> determine if these health and safety costs would have imposed an
> undue hardship . . . . The EEOC has said that when considering
> undue hardship in the context of COVID, employers should
> consider if the employee "works in a solitary or group work
> setting," "has close contact with other employees or members of
> the public," and "works outdoors or indoors." Each of these
> considerations weighs in favor of finding undue hardship here—
> firefighters work in group settings, interfacing constantly with
> coworkers and the public, both inside and outdoors.
>     Allowing unvaccinated firefighters to keep working in
> October 2021 would have come at a substantial cost to SRFR. The
> objective, unrebutted medical evidence shows that SRFR would
> have faced significant health and safety costs by allowing
> unvaccinated firefighters to continue working, even with
> accommodations. Those costs would have affected SRFR's own
> workforce and persons in the public needing emergency, even
> life-saving, services. Because firefighters did not (and likely could
> not) always mask and social distance, SRFR needed a way to
> ensure employee and public safety. Dr. Lynch's opinion explains
> that the vaccine offered the safest, easiest, and most effective way
> of doing so.

*Petersen v. Snohomish Reg'l Fire & Rescue*, 2025 WL 2503128, at *7 (internal citations

omitted). Like the firefighters in *Petersen*, Plaintiff worked in group settings, constantly interacted with coworkers and the public, including in emergency and life-saving situations, and could not always social distance. *See supra* Section I.C. Like Snohomish Regional Fire and Rescue, the City of Issaquah made its accommodation decision in October 2021, when Delta was surging and COVID-19 hospitalizations had just hit an all-time high. *See supra* Sections I.A., I.B., I.D. As further explained below, Plaintiff has not provided evidence to rebut any of these facts. *See infra* Section III.C.1.b.(2)(ii).

Also as in *Petersen*, the Defendant here has provided evidence, in the form of an extensive declaration by infectious disease specialist Dr. John Lynch, not only that vaccination was the most effective way of preventing the spread of COVID-19 to, among, and by City employees, but that, based on what was known in October 2021, "[n]o other public health strategy could effectively meet the City's goals of maintaining critical governmental services and operations while protecting the health, safety, and well-being of City employees and the public at large." Dkt. No. 16 at 31 ¶ 72. Dr. Lynch, who is currently an Associate Medical Director of Harborview Medical Center, a Professor of Medicine at the University of Washington, and a practicing infectious disease clinician, spent 2020 through 2023 as the Medical-Technical Team Lead for UW Medicine's COVID-19 Emergency Operations Center, in which role he oversaw all UW Medicine's Personal Protective Equipment (PPE) and testing policies and was involved in the vaccination rollout for UW Medicine's clinical employees. Dkt. No. 16 1–2 ¶¶ 1–2; *see also* Dkt. No. 43 at 6–7.

Defendant presents evidence from Dr. Lynch that the data available when the decision was made not to accommodate Plaintiff, as well as four months later when her separation became effective, "established that an unvaccinated person posed materially higher risks of transmitting COVID-19, including increasing the potential for causing an outbreak, contracting COVID-19,

1    and developing severe disease, compared with a vaccinated person." Dkt. No. 14 at 17 (quoting

2    Dkt. No. 16 at 40 ¶ 91. Dr. Lynch also offers opinions on each of Plaintiff's proposed

3    accommodations and explains why they were inadequate to reduce her risk of becoming infected

4    and passing infection on to coworkers and members of the community Defendant was tasked

5    with serving. *See* Dkt. No. 14 at 16–17; Dkt. No. 16 at 18–23 ¶¶ 44–53. Plaintiff's failure to

6    produce evidence rebutting these facts is discussed below. *See infra* Section III.C.1.b.(2)(ii).

7         Additionally, Defendant has presented evidence that the health and safety burdens it

8    would have taken on by permitting an unvaccinated police officer to interact with community

9    members were heightened because Plaintiff's job duties involved closely interacting with—and

10   sometimes physically touching or restraining—community members from groups that were

11   particularly vulnerable to serious illness and death from COVID-19. *See* Dkt. No. 26 at 12; Dkt.

12   No. 17 at 12, 13, 17 (Rosa Dep.); Dkt. No. 17 at 101–02 (Johnson Dep.). Plaintiff's interactions

13   with the community included transporting elderly people in her patrol vehicle, physically

14   detaining and restraining people who were unhoused, and staying with incarcerated people

15   during hospital visits. Dkt. No. 17 at 8–9, 12, 13, 17; Dkt. No. 26 at 12. These individuals,

16   including people who were incarcerated at the jail, sometimes had no option to avoid close

17   physical contact with police. As Dr. Lynch explains, "the 'infection risk' associated with

18   allowing [Plaintiff] to work while unvaccinated was distributed equally to all those groups,

19   spaces, and encounters despite the fact that the risks (of infection, transmission, severe illness,

20   and death), vulnerabilities, and vaccination statu[s]es associated with those different groups (e.g.,

21   coworkers vs. incarcerated individuals) and exposure situations (e.g., sharing a

22   bathroom/lunchroom vs. sharing a car or office) vary drastically." Dkt. No. 16 at 48 ¶ 109. And,

23   Police officers experience some of the highest rates of COVID-19 infection. Dkt. No. 15 at 41

24   ¶ 91. These facts are undisputed by Plaintiff.

### (ii)    Operational Burdens

Defendant also argues that accommodating Plaintiff would have imposed hardships including "the administrative burden of testing," citing evidence that the testing requirement required that Plaintiff and her supervisor meet twice a week while Plaintiff tested at the beginning of her shift, delaying her entire squad from beginning its morning meeting and patrol. Dkt. No. 14 at 20. Plaintiff does not contest that her testing delayed the start of meetings and patrol, but does present evidence that Sgt. Huberdeau was able to multitask during his appointments with Plaintiff, which may have been as short as 15 minutes (Dkt. No. 25-5 at 4–5).

Concern for absences is an administrative burden cited by Defendant as well. Dkt. No. 14 at 20. Defendant presents unrebutted evidence that Plaintiff's unvaccinated status made her more likely than her coworkers both to contract COVID-19 and to experience repeat infections. Dkt. No. 16 at 15 ¶ 35, 46–47 ¶ 108. These factors made it likely that Plaintiff would miss more shifts, and more often, than she would if vaccinated. Because of applicable Centers for Disease Control and Prevention ("CDC") guidelines for vaccinated versus unvaccinated individuals, Plaintiff would also have been subject to 10-day isolation even if she were merely exposed to COVID-19, ensuring that she would have missed at least a full rotation of four 12-hour shifts. Dkt. No. 17 at 86 (Knox Dep.). Plaintiff's vaccinated colleagues, subject to the same four-days-on, four-days-off schedule, but to only a five-day quarantine in the event of exposure, might have missed as little as one day of work.[10] *Id.*

As the *Petersen* court explained, Defendant's concern for the risk that Plaintiff would spread COVID-19 to her coworkers (*see* Dkt. No. 14 at 15–19) also implicated risks to its operations because an outbreak in the police force could force several officers on sick leave at

---

[10] Although Plaintiff suggests in her declaration that she was exposed to COVID-19 during work, the record does not reflect whether she was ever required to isolate or quarantine. Dkt. No. 26 at 12.

once. *Petersen*, 2025 WL 2503128, at *8. Here, both parties present evidence that IPD was understaffed during late 2021 and early 2022. An elevated likelihood that a single employee could cause an outbreak taking multiple police officers (or other critical City staff) off the job was a risk to the "community-critical nature of [Defendant's] mission," and not one that Defendant "could assume lightly." *Id.*

### (iii)   Financial Costs

In *Petersen*, the Court considered financial costs of allowing unvaccinated firefighters to work, including absenteeism, legal liability, and the fire department's risk of losing a contract to provide emergency medical services to the Department of Corrections (DOC) at its Monroe Correctional Complex, which at that time required that all on-site contractors be vaccinated. 2025 WL 2503128, at *8. Of these, Defendant here discusses only absenteeism. "Although *Groff* mentioned that temporary labor costs alone do not constitute an undue hardship, firefighter absences or a fire station COVID outbreak could hamper operations for weeks at a time. Absenteeism among firefighters not only imposed real and substantial costs to SRFR, it also threatened real costs on the community." *Id.* (citing *Groff,* 600 U.S. at 473). While the same may be true for the IPD, Defendant has not presented evidence that absenteeism would impose *financial*, as opposed to *operational*, costs. Defendant also does not argue that the cost of tests or masks used by Plaintiff was a burden. *See* Dkt. No. 14 at 20–21.

In its Motion, Defendant does not directly allege that any financial burden imposed on it was part of the "undue hardship" that made it unreasonable to accommodate Plaintiff's religious exemption. Accordingly, the Court does not find that financial costs contributed to the hardship imposed by accommodating Plaintiff.

*      *      *

Accordingly, the Court finds that Defendant has carried its burden to demonstrate that it could not reasonably accommodate Plaintiff's unvaccinated status without undue hardship on the basis of health and safety costs as well as operational burdens to Defendant.

### (2)    Plaintiff's Rebuttal of Undue Hardship Fails

Because Defendant has produced evidence to establish its affirmative defense, the burden shifts back to Plaintiff to demonstrate a genuine dispute of material fact as to Defendant's undue hardship determination. *See Lavelle-Hayden*, 744 F. Supp. 3d at 1160. Plaintiff does not carry this burden.

Plaintiff attempts to rebut Defendant's undue hardship defense primarily by challenging Defendant's decision-making process around its ability to accommodate plaintiff. These attacks largely skirt around the point that Defendant must actually prove to sustain its affirmative defense: that, based on the information available when it made its decision, "it could not reasonably accommodate the employee without undue hardship." *Lawson*, 296 F.3d at 804 (quoting *Heller*, 8 F.3d at 1438). By failing to point to evidence that rebuts Defendant's actual arguments about the hardship Plaintiff's accommodation would have posed, or that contradicts the evidence Defendant has marshalled in support of those arguments, Plaintiff has not met her burden to defeat summary judgment on this claim.

### (i)    Opinions of Dr. Harvey Risch Do Not Create a Genuine Dispute of Material Fact

Plaintiff's undue hardship analysis relies in part on the expert testimony of Dr. Harvey Risch, Professor Emeritus of Epidemiology at the Yale School of Public Health. Dkt. No. 27 ¶ 2; *see* Dkt. No. 24 at 18–22. Most relevant to Plaintiff's contention that allowing her to work as a police officer while unvaccinated did not pose substantial costs to Defendant is Dr. Risch's comparison between the risk of COVID-19 infection posed by Plaintiff herself, while

1    unvaccinated, and the risk posed by breakthrough infections expected among *all* vaccinated

2    Issaquah police officers combined. *See* Dkt. No. 24 at 11; Dkt. No. 27-1 at 11.

3        Like other Courts that have considered Dr. Risch's opinions, the Court has several

4    concerns about the opinions Dr. Risch has provided.

5        First, the majority of Dr. Risch's testimony relate to how the City of Issaquah *should*

6    have weighed the risk-related burden posed by Plaintiff, and whether the risk she posed was

7    "actionable" either in an epidemiological sense or under guidance issued by the Equal

8    Employment Opportunity Commission ("EEOC"). These opinions are inadmissible for at least

9    two reasons. The first of these, as another court in this District has repeatedly found, is that

10   Dr. Risch's opinions regarding risk and hardship are inadmissible legal conclusions. *Zimmerman*

11   *v. PeaceHealth*, No. C22-5960, 2025 WL 2458051, at *17 (W.D. Wash. Aug. 26, 2025);

12   *Strandquist v. Washington State Dep't of Soc. & Health Servs.*, No. C23-5071, 2024 WL

13   4625337, at *4 (W.D. Wash. Oct. 30, 2024). "[A]n expert witness cannot give an opinion as to

14   her legal conclusion, i.e., an opinion on an ultimate issue of law." *PeaceHealth*, 2025 WL

15   2458051, at *17 (alteration in original) (quoting *United States v. Diaz*, 876 F.3d 1194, 1197 (9th

16   Cir. 2017)). This prohibition "recognizes that, when an expert undertakes to tell the jury what

17   result to reach, this does not aid the jury in making a decision, but rather attempts to substitute

18   the expert's judgment for the jury's." *Diaz*, 876 F.3d at 1197 (citation modified). Dr. Risch's

19   opinions run afoul of this rule in providing an interpretation of applicable guidelines issued by

20   the EEOC and arguing that "the assertion that Plaintiff posed an excess Covid-19 infection risk

21   (e.g., 4.6-fold) is insufficient to establish the degree (i.e., *the undue*) of hazard. This falls into the

22   category, speculative or hypothetical hardship, that the EEOC guidelines prohibit." Dkt.

23   No. 27-1 at 13 (Risch Report).

24

1     Dr. Risch contends in his rebuttal report that he is "not opining as to the legal question

2  whether or not unvaccinated employees would have created undue hardship, as the term is used

3  by the EEOC," but it is unclear how his "undue . . . hazard" differs from the undue hardship

4  standard. Dkt. No. 27-2 at 5. Even assuming such a distinction can be drawn, however,

5  Dr. Risch's opinion that Defendant's reason for terminating Plaintiff was "prohibit[ed]" by the

6  EEOC because the City identified "no baseline absolute risk over which the increased relative

7  risk applies" is clearly a legal conclusion about whether Plaintiff's termination comported with

8  the law, and is therefore not admissible. Dkt. No. 27-1 at 13.

9     Aside from constituting improper legal opinions, the Court finds that Dr. Risch's

10  risk/hardship opinions should be excluded under Federal Rule of Evidence 403, which empowers

11  a district court to exclude evidence "if its probative value is substantially outweighed by a danger

12  of . . . misleading the jury." Dr. Risch opines that evaluating the risk posed by Plaintiff's

13  unvaccinated status on an individual basis rather than measuring it against other risks the City

14  was "tolerating" during the COVID-19 pandemic was illogical (Dkt. No. 27-2 at 9),

15  unprofessional (*id.* at 7; Dkt. No. 27-1 at 12), and wrong (Dkt. No. 17 at 183 (Risch Dep.)), and

16  that Dr. Risch's own "competing-risks analysis" to determine whether a risk is "actionable" is

17  the only acceptable decision-making heuristic and "[w]hat was needed to have been done" to

18  guide the City's accommodation decision (Dkt. No. 27-2 at 7; *see id.* at 7–8; Dkt. No. 27-1 at

19  11–12, 23. But this is not the standard under the law. *Groff* requires courts to consider whether a

20  hardship to an employer would be "substantial," not "actionable," and to do so in the "common-

21  sense manner that it would use in applying any such test." 600 U.S. at 471. Allowing Dr. Risch

22  to instruct the jury on an alternative decision-making rule would likely lead to confusion or cause

23  the jury to decide the case on an improper basis. For these reasons, Dr. Risch's opinions on

24  whether Plaintiff posed an "actionable risk," and his opinions on how Defendant should have

1    weighed or "was required to" weigh competing risks its accommodation decision, are excluded

2    both as improper legal opinions and, under Federal Rule of Evidence 403, as likely to mislead

3    the jury.

4        Although the Court will consider Dr. Risch's other opinions for the purposes of this

5    motion to the extent they are relevant, its concerns with their admissibility do not end there. As

6    in other cases in which he has offered opinions, Dr. Risch produced an expert report relying on

7    data that was largely made available after Defendant's mid–October 2021 decision that it could

8    not accommodate Plaintiff or other employees seeking vaccine exemptions. Some of the data on

9    which Dr. Risch relies were even obtained after Plaintiff's separation became final in February

10    2022. *See* Dkt. No. 16 at 124 (Lynch Rebuttal) ("Although Dr. Risch states that he used 'some'

11    materials published after the plaintiff's termination, almost 30 of his sources are from 2022 or

12    later. Even counting non-scientific sources, this is about 50% of all citations. He regularly uses

13    information that was not available at the time of the City's implementation of the vaccine

14    mandate."); *Id.* at 150 (pointing out that one study Dr. Risch cites considered the bivalent

15    COVID-19 vaccine, which was not available at the time of Defendant's vaccine mandate).

16    Relying on later-obtained data is improper because "to judge the Defendant's undue hardship

17    decision based on knowledge and information developed after the fact would hold the Defendant

18    to an impossible standard by applying the benefit of hindsight to the Defendant's decision."

19    *PeaceHealth*, 2025 WL 2458051 at *17 (citation modified) (quoting *Luxton v. Wash. State Dep't*

20    *of Veterans Affs.*, No. C23-5238, 2025 WL 896658, at *16 (W.D. Wash. Mar. 24, 2025),

21    *reconsideration denied,* 2025 WL 2080575 (May 20, 2025)) (considering Dr. Risch's opinions

22    specifically). And, of course, the efficacy of vaccines that were not yet available to Plaintiff or to

23    her coworkers is irrelevant.

24

1    Additionally, the risk calculations Dr. Risch has conducted comparing Plaintiff to her

2    coworkers appear to rely on employee numbers that are not supported by the record in this case.

3    Dr. Risch deduces Plaintiff's "[s]hare" of Defendant's "total infection burden" from a

4    hypothetical scenario in which Issaquah employs 38 police officers, and only one (Plaintiff) is

5    unvaccinated. Dkt. No. 27-1 at 12. Dr. Risch opines that even though Plaintiff's individual risk

6    was 4.6 times as high as the risk of any of her vaccinated coworkers, "[s]ome 89% of the

7    infection burden would have been attributable to breakthrough infections among the [37]

8    vaccinated police staff." *Id.* at 12–13. In deposition, Dr. Risch admitted that he did not know

9    how many police officers were employed by Defendant in 2021–22 and had approximated from

10   a 2024 figure that he found online. Dkt. No. 17 at 23–24 (Risch Dep.). However, voluminous

11   evidence suggests that staffing levels in late 2021 were uniquely low. *See, e.g.*, Dkt. No. 26 at

12   11; Dkt. No. 15 at 49. Dr. Risch further admitted that he was not given information about

13   whether other police officers had requested religious exemptions. *Id.* at 24. The record before the

14   Court does not clarify exactly how many police officers requested religious exemptions from the

15   COVID-19 vaccine, only that that Plaintiff was the only remaining unvaccinated member of her

16   union as of November 15, 2021. Dkt. No. 15 at 49. At the time Defendant made its decisions on

17   accommodation, however, it was faced with evaluating risks posed not only by police-officer

18   employees but *all* employees, and Plaintiff was not the only employee of the City of Issaquah to

19   request and be granted a religious exemption from the COVID-19 vaccine. *See supra* Section

20   I.D. The EEOC guidelines also require the consideration of the cumulative burden of multiple

21   unvaccinated staff, as Dr. Risch himself repeatedly emphasizes (*see* Dkt. No. 27-1 at 13, Dkt.

22   No. 27-2 at 5).

23   Putting these concerns aside, and assuming that Dr. Risch's opinions are admissible

24   (apart from his improper legal conclusions), Dr. Risch's opinions do not create a genuine dispute

1 of fact about the substantial costs Defendant would have faced by accommodating Plaintiff.

2 Dr. Risch reports that the CDC's estimate of the relative risk of symptomatic COVID-19

3 infection in unvaccinated versus vaccinated individuals in fall 2021, based on the reported

4 vaccine efficacy of 78%, supported a 4.6-fold increased risk for unvaccinated individuals. Dkt.

5 No. 27-1 at 8. A later estimate of vaccine efficacy against the Delta variant of COVID-19 found

6 a 2.8-fold increased risk. *Id.* In other words, the most conservative calculation relied on by

7 Plaintiff's own expert stills assume Plaintiff's risk of developing a symptomatic COVID-19

8 infection to be nearly *triple* that of a vaccinated individual. As courts in this district have

9 previously observed, "applied at the individual level, Risch's calculations show that an

10 individual vaccinated employee carried a significantly lower risk of infection than an

11 unvaccinated employee." *Luxton*, 2025 WL 896658, at *16. "Nothing in Title VII"—or,

12 therefore, in the WLAD—"requires [an employer] to disregard the serious risk to the health and

13 safety of those individual[s] simply because, on a system-wide level, there remained a

14 comparable risk from breakthrough infections that could not be eliminated even with required

15 vaccination." *PeaceHealth* 2025 WL 2458051 at *18.

16

     **(ii) Plaintiff Has Not Produced Evidence to Rebut**
17       **Health and Safety Costs**

18    Where Plaintiff directly addresses the potential hardship imposed by her

19 accommodations, she focuses on the operational and financial burdens. In a subsection titled

20 "Taking each accommodation alleged as an undue burden in turn," she addresses first

21 "Masking," then the "Cost and administrative burden of testing." Dkt. No. 24 at 23. Plaintiff

22 disputes that masking imposed a substantial burden by asserting that the City's "N95 masks

23 //

24 //

1  never ran out of supply." *Id.*[11] However, Defendant has not identified the cost or unavailability

2  of masks as part of its undue hardship defense. *See* Dkt. No. 14 at 20–21. As for testing, Plaintiff

3  has provided evidence that the tests used by Plaintiff were obtained by the City free of charge

4  (Dkt. No. 25-2 (Johnson Dep.) at 8), and that the testing burden on Sergeant Huberdeau's time

5  was minimal (Dkt. No. 25-5 at 4–5).[12] Defendant offers no evidence that the test supply ever ran

6  out, and Chief Paula Schwan testified that she did not believe they did. Dkt. No. 25-1 at 15–16.

7       On this record, the Court agrees with Plaintiff that a jury could find that Plaintiff's

8  masking and testing protocols *alone* did not impose a substantial burden on Defendant. But that

9  is not the question presented by this case. The most significant accommodation required by

10  Plaintiff was to remain unvaccinated, and it is clear from Defendant's motion that the risk

11  imposed on Defendant by Plaintiff's unvaccinated status, even with her other accommodations in

12  place, is the predominant hardship that Defendant contends was undue. Dkt. No. 14 at 16–19; *see*

13  *supra* Section III.C.1.b.(1). Defendant has presented extensive evidence, most of it uncontested,

14  to establish the significant health and safety cost of accommodating Plaintiff.

15       Defendant, relying on case law and the extensive declaration of Dr. Lynch, has presented

16  evidence that COVID-19 was extremely contagious and that, if Plaintiff became infected, she

17  could transmit the disease to coworkers and members of the public, even if masked. Dkt. No. 14

18  at 4–5, 16–17). Plaintiff presents no evidence to rebut this.

19       Defendant, relying on Dr. Lynch's declaration, presents evidence that, at the time of

20  Defendant's decision that it could not accommodate Plaintiff's vaccine exemption, King County

---

21  [11] Though this point is ultimately irrelevant to the analysis here, the Court notes that the deposition testimony cited
22  by Plaintiff does not clearly support this statement. *See* Dkt. No. 25-5 at 4–5; Dkt. No. 25-1 at 15–16; *see also* Dkt.
   No. 43 at 20 & n.9 (admonishing Plaintiff's counsel for this and other liberties taken in the characterization of
23  deposition testimony).

   [12] Plaintiff does not address operation costs of her accommodation beyond obtaining masks and tests and conducting
   her biweekly test with her supervisor. *See generally* Dkt. No. 24. Specifically, Plaintiff does not contest the evidence
24  presented by Defendant related to the operational burden of absenteeism. *See supra* Section III.C.1.b.(1)(ii).

ORDER ON MOTION FOR SUMMARY JUDGMENT – 33

had just experienced a spike in COVID-19 infections due to the Delta variant, and at the time Plaintiff's separation became effective, it had experienced another spike due to the Omicron variant. *Id.* at 19. Plaintiff presents no evidence to rebut this.

Both Parties have presented evidence that Plaintiff's job duties required her to work in person and to regularly interact with City employees and community members. Dkt. No. 18 at 5–8; Dkt. No. 26 at 12; Dkt. No. 17 at 8–17 (Rosa Dep.); Dkt. No. 17 at 101–02 (Johnson Dep.). Plaintiff's interactions with the community included transporting elderly people in her patrol vehicle, physically detaining and restraining people who were unhoused, and staying with incarcerated people during hospital visits. Dkt. No. 17 at 8–9, 12, 13, 17; Dkt. No. 26 at 12. Plaintiff does not rebut Defendant's evidence that individuals from these communities were uniquely endangered by COVID-19. Dkt. No. 16 at 7 ¶ 12; *see generally* Dkt. No. 24.

Defendant, relying on Dr. Lynch's declaration, presents evidence that Plaintiff's risk of COVID-19 infection as an unvaccinated individual was more than double that of a vaccinated person. *Id.* at 20. Plaintiff provides no evidence to rebut this, and her own expert's report indicates a similar or higher factor of increased risk. *See* Dkt. No. 27-1 at 8. As explained *supra* Section III.C.1.b.(2)(i), Dr. Risch assumed Plaintiff had either a 4.6-fold or 2.8-fold increased risk compared to unvaccinated individuals. Dkt. No. 27-1 at 8. Plaintiff does not argue that a 2.8-factor relevant risk is not a significant burden and, in fact, seems to misunderstand Dr. Risch's conclusions by asserting "her relative risk was significantly lower than other employees not subject to" masking, social distancing, and testing. Dkt. No. 24 at 21 (citing Dkt. No. 27-1 at 30 (Risch Report)).[13] But this statement is unsupported by the record.

---

[13] While the portion of Dr. Risch's report cited here by Plaintiff does refer to "masking, distancing and testing," it does not support Plaintiff's assertion that these accommodations reduced Plaintiff's risk to any degree. Rather, Dr. Risch opines that opinions presented by Defendant's expert as to masking, testing, and social distancing are "[n]ot really relevant" because "[n]one of these were necessary to be particularly effective in order that Plaintiff's expected

1      Finally, Defendant has presented extensive evidence from Dr. Lynch that "the

2  alternatives of testing, masking, and social distancing are inferior to vaccination and that even

3  with such safety measures in place, an unvaccinated person posed materially higher risks than

4  vaccinated persons of contracting COVID-19, transmitting COVID-19 to others, and developing

5  severe disease." Though Plaintiff soundly disagrees with these conclusions, she has not offered

6  *any* evidence on the effectiveness of masking, social distancing, or testing, and accordingly has

7  not rebutted Defendant's evidence that, while these interventions have some value, they were not

8  sufficient to reduce Plaintiff's infection/transmission risk such that allowing her to remain

9  unvaccinated would not pose an undue hardship. Plaintiff's unsupported assertions such as "less

10 restrictive measures such as masking could be used to prevent the spread" are not evidence. Dkt.

11 No. 24 at 29; *see also Hernandez,* 343 F.3d at 1112. Moreover, these statements are contradicted

12 by the opinions offered by Plaintiff's own expert (*see* Dkt. No. 27-1 at 20 ("I agree with Dr.

13 Lynch that these approaches have not substantially reduced the spread of Covid-19."), and even

14 by statements made by Plaintiff's counsel elsewhere in Plaintiff's own response (*see* Dkt. No. 20

15 at 24 ("there is <u>insufficient</u> evidence to show that masking and testing were tools which also

16 stemmed the spread")).[14]

17      Accordingly, Plaintiff has not met her burden of production to rebut Defendant's undue-

18 hardship evidence with respect to the health and safety costs of accommodating Plaintiff's

19 request.

20

21 _____

22 risk would still be dramatically lower than the breakthrough infection risks posed by the large body of vaccinated
   staff." Dkt. No. 27-1 at 30. Elsewhere, Dr. Risch offers no opinions on testing, masking, and social distancing
23 beyond that "these approaches have not substantially reduced the spread of Covid-19" but were "believed in
   [2020–21] to have some degrees of effectiveness." *Id.* at 20.

24 [14] While the Court acknowledges that counsel may have intended to say there was "*sufficient*" evidence," the portion
   of Dr. Risch's report cited in support of this assertion does in fact reject, rather than support, the effectiveness of
   "[a]lternatives to vaccination such as regular testing, distancing, air-flow barriers."

1

(iii)    **Plaintiff's Other Hardship Arguments Fail**

2      Plaintiff offers a hodgepodge of other arguments in an attempt to rebut Defendant's

3  undue-hardship defense.

4      Foremost among these, Plaintiff repeatedly raises arguments grounded in the premise that

5  her accommodation "was not a hardship for four months" (Dkt. No. 24 at 14), suggesting that

6  Defendant should have considered the incidence of COVID-19 infections among its vaccinated

7  and unvaccinated staff (*id.* at 17) and determined that "risk was low looking backwards over four

8  months," with Plaintiff's accommodations in place (*id.* at 18).[15] This argument fails. First, the

9  idea that Plaintiff's temporary accommodations "proved . . . safe" because she did not test

10  positive while accommodated defies common sense. *Id.* at 18, 21. A lack of incident is not the

11  same as a lack of risk. To borrow an apt analogy offered by Defendant's counsel at oral

12  argument, such reasoning is like using one person's record of incident-free driving to argue

13  against the necessity of seatbelts. Whether or not Plaintiff managed to avoid COVID-19 (or at

14  least a symptomatic presentation of it) changes neither the risk Defendant assumed by employing

15  her, nor the scientific fact that she individually bore a much higher danger of contracting and

16  spreading COVID-19 than any of her vaccinated coworkers. Such risk is not a speculative harm

17  but a real cost that courts (and employers) may consider. *Bordeaux*, 703 F. Supp. 3d at 1136

18  (collecting cases); *see also Petersen*, 2025 WL 2503128, at *9 ("[W]e do not understand 'undue

19  hardship' to mean 'realized hardships.' An undue hardship may include an evaluation of the risk

20  of hardship, not just an accounting of damages actually suffered. The risk of undue hardship,

21

22  ─────────────────────────
[15] At oral argument, Plaintiff's counsel submitted that this period of temporary accommodation makes Plaintiff's
23  WLAD claim unique, distinguishing it from all failure-to-accommodate-vaccine-exemption claims that have come
before. The Court disagrees. The record here shows that Defendant's other vaccine-exempt employees were
temporarily accommodated between October and December 2021, and Plaintiff has offered neither evidence that
24  employees elsewhere were not given similar notice periods involving temporary accommodation, nor a compelling
reason this distinction would be legally significant.

however, must be realistic and not 'merely conceivable or hypothetical.'" (citing *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988))).

Next, Plaintiff has offered no authority in support of her claim that Defendant should have "acknowledge[d] that Ms. Dixson may possess natural immunity and . . . consider[ed] this aspect as part of her accommodation." Dkt. No. 24 at 19. While Plaintiff's expert offers opinions related to *post-infection* immunity, called "natural immunity" in some of the studies he cites, this type of immunity would not have been a relevant consideration for Plaintiff, whose position and belief are that she has never had COVID-19. *See* Dkt. No. 27-1 at 7, 33; Dkt. No. 26 at 12. As Dr. Lynch explains, "From an immunological perspective, the only way to have a COVID-specific immune response" is to be exposed to the virus, either through vaccination or by becoming infected. Dkt. No. 21-1 at 41 ¶ 77.

Plaintiff's suggestions of alternative accommodations the City allegedly did not consider (leave or reassignment) do not create a dispute of material fact. Dkt. No. 14 at 12, 18. First, this Court agrees that "paid administrative leave until the end of the pandemic was not reasonable." *Duden v. Washington*, 2025 WL 20749, at *4 (E.D. Wash. Jan. 2, 2025). Unpaid leave was also unreasonable, since it was not known how many months or years Defendant would require vaccination for employees or how long the pandemic would last. Similarly, Plaintiff's assertion (in the facts section of her response, without corresponding argument) that Defendant should have placed her in a dispatcher position, which "could have easily facilitated social distancing" is unsupported by the deposition testimony in the record. Dkt. No. 14 at 12. Rather, dispatchers worked "directly with other individuals i[n] probably one of the closest spaces" in the police department, and Defendant could not "ensure social distancing in that environment." Dkt. No. 17 at 70–71 (Johnson 30(b)(6) Dep.); *see also id.* at 99 (Johnson Dep.) ("[T]he City . . . did not find really any position that we could accommodate someone without, you know, a health and safety

risk."). Furthermore, there is no evidence that Plaintiff would have agreed to be reassigned to an entry-level dispatcher role or placed on leave.

Finally, Plaintiff attempts to support her position with assertions that Defendant periodically required or encouraged masking as part of its COVID-19 response. *See, e.g.,* Dkt. No. 24 at 6, 20. But this fact, which is not disputed, does nothing to rebut Defendant's evidence that masking, testing, and social distancing could not adequately mitigate the increased risk of infection (and thus the burden) imposed by Plaintiff's unvaccinated status.

Accordingly, the Court GRANTS summary judgment in favor of Defendant on Plaintiff's WLAD claim.

### 2.     Claim Two: Civil Service Violation

Plaintiff's second cause of action is for "Violation of RCW 41.12 and City of Issaquah Civil Service Rules and Regulations." Chapter 41.12 of the Revised Code of Washington sets civil service rules for city police in Washington. However, its first provision—as Plaintiff acknowledges in her complaint (Dkt. 1-2 ¶ 90)—sets forth that the chapter has "no application to cities and towns which . . . provide for civil service in the police department by local charter or other regulations which said local charter or regulations substantially accomplish the purpose of this chapter . . . ." RCW 41.12.010. As Issaquah clearly has its own civil service regulations ("ICSR") (the other stated basis for this claim), and as Plaintiff does not argue that the RCW and the ICSR do not "substantially accomplish" the same purposes, the Court assumes Chapter 41.12 RCW has no application to the City of Issaquah and will consider only Plaintiff's asserted cause of action under the ICSR.[16]

//

//

---

[16] At oral argument, Plaintiff's counsel confirmed that Plaintiff is only pursuing this claim under the ICSR, not Chapter 41.12 RCW.

1    Defendant raises several challenges to the ICSR claim: that the ICSR does not create a

2    private right of action (Dkt. No. 14 at 21); that Plaintiff never exhausted her administrative

3    remedies (*id.* at 22–23); and that the Civil Service rules do not apply to Plaintiff at all because

4    she "was not discharged as discipline for misconduct, which is what the rules address" (*id.* at

5    22).

6    As Plaintiff is trying to bring a claim under the ICSR itself, rather than circumvent it, the

7    first inquiry is immediately pressing. Suit cannot be brought under a law unless the law itself

8    includes an explicit or implied right of action, or some other applicable law creates a right of

9    action for its violation. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002). Here, the

10   language of the ICSR does not explicitly create a right of action. Defendant points this out and

11   urges that the Court should not "imply an expansive private right of action that the legislature did

12   not intend." Dkt. No. 14 at 21 (citing *Ives v. Ramsden*, 142 Wn. App 369, 388 174 P.3d 1231

13   (2008)). Plaintiff, bafflingly, makes no response. She does not argue that there is an implied right

14   of action within the ICSR or point to any external authority granting such a right, and the Court

15   will not search for support for Plaintiff's arguments for her. *See Ayers v. Richards*, No. C08-

16   5390, 2010 WL 4366069, at *2 (W.D. Wash. Aug. 3, 2010) ("[T]he court need not search for

17   evidence or manufacture arguments for a plaintiff."), *report and recommendation adopted*, 2010

18   WL 4365555 (Oct. 28, 2010). Where a court has "found no express or implied right of action,

19   summary judgment for defendants is proper . . . ." *Thompson v. Spalding*, No. C05-1995, 2006

20   WL 2918999, at *4 (W.D. Wash. Oct. 11, 2006).

21   Even if Plaintiff could point to a right of action under the ICSR, she would not be able to

22   assert it without first exhausting any administrative remedies available to her here. Here again,

23   Defendant has raised an issue potentially fatal to Plaintiff's claim (*see* Dkt. No. 14 at 22–23), and

24   Plaintiff has offered no response (*see* Dkt. No. 24 at 26–27). The Court only has Defendant's

1   arguments to consider, and they are convincing. The ICSR sets forth a process of administrative

2   appeals before the City's Civil Service Commission for certain employee grievances, *see* ICSR

3   Ch. 5, and this is the process applicable to employees discharged under Rule 15. Regardless of

4   whether Defendant violated its civil service rules in terminating Plaintiff, Plaintiff may not assert

5   a claim under Chapter 15 of the ICSR when she made no effort to avail herself of the

6   administrative appeal that chapter provides.

7       Although the inquiry could already have ended twice over, the Court finds it prudent to

8   acknowledge what Plaintiff *did* offer in her reply, and address in brief the merits of her

9   arguments. To the extent Plaintiff provides analysis with a discernable relationship to a civil

10  service claim (rather than irrelevant due process standards like "property interest" and the

11  creative "liberty interest she holds in property"), the core of her argument is that "ICSR requires

12  that no civil servant, including Police Officers, be discharged except for cause" (Dkt. No. 24 at

13  26), and that under the ICSR Plaintiff could "only be terminated for disciplinary actions" (*Id.*

14  at 27). Except for an obviously inapplicable statement of Ohio statutory law[17] (*Id.* (quoting

15  *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 535 (1985)), Plaintiff's response does not

16  point to specific authorities establishing the rights she alleges were violated. In her complaint,

17  Plaintiff focuses on ICSR Rule 15, asserting that this Rule "describes the exclusive reasons for

18  'discharge, suspen[sion] without pay, demotion, and other deprivations'"[18] and that "Plaintiff

19  was not discharged for any of the reasons listed" in Rule 15. Dkt. No. 1-2 ¶ 93.

20  ___

[17] Just as unhelpful is Plaintiff's assertion, in her facts section, that "[i]n a similar set of facts and circumstances City of Redmond terminated firefighters for 'failing to be physically fit,' a disciplinary action." Dkt. No. 24 at 13. Redmond is not bound by Issaquah's municipal rules any more than Issaquah is bound by Ohio law. Unfortunately, irrelevancy is the least of the Court's concerns about Plaintiff's citation to this "authority" (deficiently cited only as "2:22-cv-01739-JNW"). In confirming the citation, the Court was alarmed to find that the case, *Carlson v. City of Redmond et al.*, is an open one in which no ruling on the merits had been entered at the time Plaintiff cited to the case. Plaintiff's counsel in the instant case is also one of the plaintiffs' attorneys in *Carlson*, suggesting that the citation was not to any legal authority but rather to what can only be described as counsel's own untested allegations on behalf of another client (unsupported by any evidence in the record before this Court).

[18] This purported quotation to ICSR 15 does not accurately quote the text of the rule.

ORDER ON MOTION FOR SUMMARY JUDGMENT – 40

The premise that non-disciplinary discharges are not allowed under the ICSR fails as a matter of law based on the plain text of the ICSR.[19] ICSR Rule 15 governs "Discharge, Demotion, Suspension, Other Disciplinary Actions, and Resignations," and Rule 15(a) indeed lists types of misconduct that can form the basis of discharge or other discipline. Discharge, defined as "separation from service for cause," ICSR Rule 2.19, is governed by Rule 15 *when it is disciplinary*, that is, when its "cause" is based on any reason under Rule 15.01. But contrary to Plaintiff's assertions (and Defendant's, *see* Dkt. No. 14 at 22 n.12),[20] Issaquah's Civil Service Rules *also* provide for non-disciplinary discharges under certain conditions—just not under Rule 15. Rule 9.04 provides a process, up to and including discharge "without prejudice," to be followed when "an employee who has previously qualified is found to be unable to perform the essential functions of the position due to a disability." Under such circumstances, "if there is not a suitable position in which the employee can perform satisfactorily, the appointing authority may discharge the employee, subject to the employee's rights of appeal[,] said discharge to be without prejudice as to re-employment should the condition improve . . . ." *Id.* Rule 9.04(c).

To be sure, it was not a disability that prevented Plaintiff from performing a requirement of her job (getting vaccinated against COVID-19), and Rule 9.04(c) does not apply directly to

---

[19] Plaintiff's more extreme assertions that the ICSR does not allow or even contemplate "non-disciplinary *separation*" (Dkt. No. 24 at 13, 24; Dkt. No. 1-2 ¶¶ 92, 94 (emphasis added)) is disproven by her own citation to the ICSR's definition of "separation," which means "leaving a position and includes resignation, discharge, and layoff." Dkt. No. 24 at 24 (quoting, without attribution, ICSR Rule 2.37). Both resignation and layoffs are examples of non-disciplinary separation.

[20] Defendant's analysis of the purpose and content of the ICSR has the Court scratching its head. Defendant's assertion that "the Civil Service Rules are inapplicable" because Plaintiff "was not discharged as discipline for misconduct, which is what the rules address" (Dkt. No. 12 at 22); the inaccurate concession that the Rules "do not mention non-disciplinary discharges" (*id.* at 22 n.12); and the rationalization that this omission "makes sense given their stated purpose" (an apparent reference to the purpose of Chapter 41.12 RCW, not the Issaquah Civil Rules) (*id.*), all present the ICSR as though its entire substance comprised Rule 15 exclusively. In fact, the ICSR includes many provisions advancing a much broader set of goals related to the fair and efficient administration of the Issaquah Civil service. *See* ICSR Rule 1.02 (Purpose). Some of these, like the provisions establishing rights and procedures for appeals hearings, may indeed have applied to Plaintiff during her separation. *See id.* Rule 5.

Ultimately, however, Defendant's tunnel vision is inconsequential, as Plaintiff similarly focuses narrowly on Rule 15 and, in any case, has not stated a claim for relief.

her separation. But its existence proves that disciplinary discharges are not the only allowable

discharges under the ICSR. Clearly, the Rules contemplate non-disciplinary discharges where an

employee can no longer perform essential job functions. To the extent that the specific

circumstance of vaccine refusal during a global pandemic was unforeseen and therefore

unaddressed, Plaintiff has pointed to nothing in the ICSR that prohibits non-disciplinary

separations under unanticipated circumstances, and the notice and process afforded to Plaintiff

appear highly analogous to those required for the non-disciplinary discharges described in Rule

9.04. *See* Dkt. No. 15 at 59–60 (Notice of Intent to Separate Employment) (giving notice of the

cause of separation and informing Plaintiff that her employment would "end in good standing"

and that she would be considered for reemployment if she became vaccinated in the future).

Accordingly, the Court therefore GRANTS summary judgment in favor of Defendant on

Plaintiff's civil service claim

### 3.    Claim Three: Violation of the Free Exercise Clause

The Free Exercise Clause "protect[s] religious observers against unequal treatment"

based on their "religious status" by barring laws "prohibiting the free exercise" of religion.

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (alteration in

original) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)); *see*

U.S. Const. amend. I. A law that burdens religion and is not neutral or generally applicable must

survive strict scrutiny. That is, the burden on religion "must be justified by a compelling

governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S.

at 531–32. However, "a neutral law of general application need not be supported by a compelling

government interest even when 'the law has the incidental effect of burdening a particular

religious practice. Such laws need only survive rational basis review." *Stormans, Inc. v.

Wiesman*, 794 F.3d 1064, 1075–76 (9th Cir. 2015) (citation modified). Accordingly, the right to

freely exercise one's religion "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 1075 (citation modified).

In evaluating a Free Exercise claim, the "initial inquiry" is therefore "whether a challenged law is neutral [and] generally applicable." *Moriarty v. Port of Seattle*, No. C23-1209, 2024 WL 4290279, at *4 (W.D. Wash. Sept. 25, 2024) (citation modified). If it is both, the law must survive only rational basis review. Otherwise, strict scrutiny applies. *Lukumi*, 508 U.S. at 531. "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.*

Plaintiff alleges that Defendant's vaccine mandate "placed a substantial burden on Ms. Dixson's free exercise of religion because she could not receive a vaccination without violating her sincerely held religious beliefs, and she was terminated despite the proven availability of a reasonable accommodation . . . ." Dkt. No. 1-2 at 19. Defendant argues that the mandate was neutral and generally applicable and that it survives rational basis review. *See* Dkt. No. 14 at 24–28. Plaintiff argues that the mandate was neither neutral nor generally applicable, either on its face or as applied, and is thus subject to strict scrutiny, which it does not survive. Dkt. No. 24 at 28–30.

### a.    Defendant's Vaccination Policy Was Neutral and Generally Applicable

The principles of facial neutrality and general applicability are perhaps best illustrated by the facts underlying the Supreme Court's decision in *Lukumi*, 508 U.S. at 533. In *Lukumi*, the plaintiff church brought suit after the city of Hialeah, Florida, adopted several ordinances prohibiting animal sacrifice, a practice of the Santeria faith. *Id.* at 524–28. The Supreme Court ruled that a law "lacks facial neutrality if it refers to a religious practice without a secular

meaning discernable from the language or context." *Id.* at 533. Applying this test to the ordinance before it, the *Lukumi* Court found that the religious connotations of the words "sacrifice" and "ritual" were "consistent with a claim of facial discrimination" but that this language was "not conclusive" on its own. *Id.* at 534.

Under the test established in *Lukumi*, "COVID-19 vaccination requirements have been held to be facially neutral when they apply to an entire category (i.e., all employees) and 'do[] not single out employees who decline vaccination on religious grounds.'" *Schmidt v. City of Pasadena*, No. C21-8769, 2023 WL 4291440, at *13 (C.D. Cal. Mar. 8, 2023) (alteration in original) (quoting *UnifySCC v. Cody*, No. C22-1019, 2022 WL 2357068, at *6 (N.D. Cal. June 30, 2022)); *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281–84 (2d Cir. 2021). "The existence of religious exemptions does not undermine facial neutrality." *UnifySCC*, 2022 WL 2357068, at *6.

The *Lukumi* court also clarified the related standard of general applicability, holding that "[a] law is not generally applicable if the record before the court 'compels the conclusion' that suppression of religion or religious practice is the object of the law at issue." *Wise v. Inslee*, No. C21-288, 2022 WL 1243662, at *4 (E.D. Wash. Apr. 27, 2022) (quoting *Lukumi*, 508 U.S. at 534). Hialeah's animal-sacrifice ordinances compelled such a conclusion because—though the city protested that its chief concern was public health, which was "threatened by the disposal of animal carcasses in open public places"—the ordinances did not regulate hunters' disposal of their kills or improper garbage disposal by restaurants, which posed similar hazards. *Lukumi*, 508 U.S. at 544–45. "The Court concluded that this and other forms of underinclusiveness meant that the ordinances were not generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) (citing *Lukumi*, 508 U.S. at 545–46).

"A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (quoting *Fulton,* 593 U.S. at 534). However, explicit, categorical exemptions for religious objectors, with accommodations to be considered based on non-discretionary criteria, are not "individualized exemptions" within the meaning of *Fulton*. *Nilsen v. Univ. of Wash. Med. Ctr.*, No. C23-1498, 2024 WL 4723233, at *9 (W.D. Wash. Nov. 8, 2024) (citing *Fulton*, 593 U.S. at 533).

The unrebutted evidence before the Court shows that Defendant's vaccine policy was facially neutral. On its face, Defendant's policy makes no reference to any religious practice, conduct, belief, or motivation. *See* Dkt. No. 15 at 15. The policy applied to all employees of the City of Issaquah. *Id.* at 45. Defendant's vaccine policy treated religion differently only in that it offered employees who objected to the vaccine requirement due to their sincerely held religious beliefs a process by which to seek exemption from the vaccination requirement. This does not show the absence of neutrality. *See Schmidt*, 2023 WL 4291440, at *13; *UnifySCC*, 2022 WL 2357068, at *6. For these reasons, the Court concludes that Defendant's vaccination policy was facially neutral.

The general applicability analysis looks first to the text of the law to determine if its "object or purpose . . . is the suppression of religion or religious conduct." *Lukumi*, 508 U.S. at 533. Here, the object of Defendant's vaccination requirement is clear: to "ensure the health and safety of our employees" Dkt. No. 15 at 23 (Administrative Order). This is not a facially discriminatory objective. Next, the vaccination requirement applied with equal force to all City employees. *Id.* at 2 ¶ 8; *id.* at 81 (Bobkiewicz–All City emails). As this Court and others in this Circuit have found, these factors taken together establish that there is no discriminatory animus

1    or objective. *See, e.g.*, *Moriarty*, 2024 WL 4290279, at *5 (finding no discriminatory animus or

2    objective of Port of Seattle's vaccination requirement where object was to protect employees,

3    their families, and the community, and requirement "applied with equal force to all Port

4    employees"); *Wise*, 1243662, at *4 (same, where object of vaccination requirement was to slow

5    the spread of COVID-19 and requirement "applied with equal force to all educators, healthcare

6    workers, and state employees and contractors, regardless of religious affiliation"); *Bacon v.*

7    *Woodward*, No. C21-296, 2021 WL 5183059, at *4 (E.D. Wash. Nov. 8, 2021) (same with

8    regard to city-employed firefighters). While Plaintiff testified that she felt Defendant "pressured

9    [her] for months to receive a vaccine that violated [her] sincerely held religious beliefs," (Dkt.

10   No. 26 at 3), this does not indicate that "object or purpose" of Defendant's vaccine policy was

11   the "suppression of religion or religious conduct," *Lukumi*, 508 U.S. at 533 Further, Plaintiff has

12   not shown that the policy did not apply equally to employees who did not share her religion, or

13   that it prohibited religious conduct while permitting secular conduct that undermines the

14   objective of preventing the spread of COVID-19 in a similar way.

15        Plaintiff cites *Fulton* to argue that "a law cannot be considered generally applicable if it

16   allows individualized exemptions or carve outs" (Dkt. No. 24 at 28) but ignores the specific

17   circumstances faced by the *Fulton* Court. "The Court in *Fulton* highlighted the problematic fact

18   that the city commissioner had the 'sole discretion' to determine whether to grant foster care

19   providers a religious exemption [to its non-discrimination requirement] without any objective

20   criteria." *Nilsen*, 2024 WL 4723233, at *9 (citing *Fulton*, 593 U.S. at 535, 536). Under those

21   circumstances, the Court concluded "that the inclusion of a formal system of entirely

22   discretionary exceptions . . . render[ed] the contractual non-discrimination requirement not

23   generally applicable." *Fulton*, 593 U.S. at 536.

24

Here, Defendant's exemption and accommodation policy, like others considered by courts in this District and beyond, "remains generally applicable because it did not allow [officials] to make discretionary accommodation decisions." *Nilsen*, 2024 WL 4723233, at *9; *see also Pilz v. Inslee*, No. C21-5735, 2022 WL 1719172, at *5 (W.D. Wash. May 27, 2022) ("Performing an 'individualized assessment,' presumably requiring agencies to exercise a modicum of due diligence to confirm that exemption requests are not fraudulent or incomplete, is not the same as giving government officials wide latitude to deny exemptions for any reason. Therefore, the Proclamation's standardized exemptions do not prevent the Court from finding the law generally applicable, and thus do not trigger strict scrutiny."), *aff'd*, No. 22-35508, 2023 WL 8866565 (9th Cir. Dec. 22, 2023). As for the exemptions themselves, it appears Defendant "offered . . . religious exemptions to those who claimed them," *Nilsen*, 2024 WL 4723233, at *9, without "invit[ing] the government to consider the particular reasons for" religious objections to vaccines, *Fulton*, 593 U.S. at 523. *See* Dkt. No. 15 at 40 ("If an exemption request is properly supported, the next step in the process is for the City to determine whether it can reasonably accommodate the unvaccinated employee in the workplace.")

As for Defendant's evaluation of whether exemptions could be accommodated, Plaintiff was informed upon requesting an accommodation that these were considered "properly granted unless they are unreasonable, impose an undue hardship, or involve a direct threat to health and safety." Dkt. No. 15 at 40. This analysis, Plaintiff was told, would consider an employee's "duties, responsibilities, and working conditions," their "daily direct contact . . . with the public when delivering services," if they were "subject to close contact with other employees" in their "workplace environment," "developments with the virus that have made COVID-19 more contagious and easier to transmit," and "whether the risk posed by or to an unvaccinated employee can be eliminated or sufficiently mitigated." *Id.* at 40–41. Plaintiff has not offered

evidence that these factors were not actually considered, and Defendant presents testimony from city officials that they were. Dkt. No. 17 at 84–86 (Knox Dep.); *id.* at 101–104 (Johnson Dep.). "These are sufficiently delineated and objective criteria that do not evidence any discretion that would '"invite" the government to decide which reasons for not complying with the policy are worthy of solicitude.'" *Nilsen*, 2024 WL 4723233, at *9 (quoting *Fulton*, 593 U.S. at 533). Moreover, although the *Fulton* court found a facial violation of the free exercise clause where "the State ha[d] in place a system of individual exemptions" and "refuse[d] to extend that system to cases of 'religious hardship,'" the exemption extended by Defendant here shows the reverse: that is, special solicitude for religious beliefs. *Fulton*, 593 U.S. at 534. As other courts have observed in considering similar vaccine mandates, "[a] benefit to religion does not disfavor religion in violation of the Free Exercise Clause." *Bacon*, 2021 WL 5183059, at *4 (quoting *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 744 (7th Cir. 2015)); *see also UnifySCC*, 2022 WL 2357068, at *7 ("[T]he Mandate expressly accommodates employees with religious objections by allowing them to seek an exemption from the Mandate.").

Plaintiff appears to suggest that, even if Defendant's vaccine mandate was neutral and generally applicable on its face, it was not neutral and/or generally applicable as applied by Defendant. However, Plaintiff has alleged only one fact supporting that Defendant did not apply its policy consistently and to all employees: "The accommodation given to [Plaintiff] runs afoul of neutrality because it allowed her a longer extension than any other employee who was accommodated until December. Even though to her favor, it still shows arbitrary and capricious enforcement." Dkt. No. 24 at 29. This argument—which goes to general applicability, not neutrality—fails for several reasons. First, the record is clear that the decision to extend Plaintiff's temporary accommodation was not arbitrary and capricious, but was the product of months of negotiation with Plaintiff's union and had multiple supporting justifications. *See supra*

1    Section I.D. Second, Plaintiff has no standing to assert a constitutional challenge on the ground

2    that Defendant's application of its vaccine policy favored her over others. *See Lujan v. Defs. of*

3    *Wildlife*, 504 U.S. 555, 560 (1992) (The "irreducible constitutional minimum of standing"

4    requires, in part, that a plaintiff have "suffered an 'injury in fact'" and that there "be a causal

5    connection between the injury and the conduct complained of . . . ."). More generally, Plaintiff

6    has not met her burden to show that religious objections to vaccination were treated less

7    favorably than similar secular objections or exemptions.[21] With respect to operational neutrality,

8    Plaintiff provides no evidence that the religion of an employee (or that an employee has a

9    religious exemption) influenced the City's accommodation decisions. "For example, Plaintiff[]

10   do[es] not allege employees who obtained medical-condition exemptions were treated favorably,

11   e.g., did not have to submit to [bi-]weekly COVID-19 testing, as compared to employees who

12   obtained an exemption on religious grounds." *George v. Grossmont Cuyamaca Cmty. Coll. Dist.*

13   *Bd. of Governors*, 2022 WL 16722357, at *16 (S.D. Cal. Nov. 4, 2022). This distinguishes her

14   claim from those like the plaintiffs' in *Bacon v. Woodward*, 104 F.4th 744 (9th Cir. 2024), which

15   Plaintiff's counsel invoked at oral argument, and other cases in which as-applied challenges to

16   employers' vaccine policies were allowed to move forward. *See also Cox v. Nw. Reg'l Educ.*

17   *Serv. Dist.*, No. C22-1073-HZ, 2024 WL 777598, at (D. Or. Feb. 23, 2024).

18       In *Bacon*, the Ninth Circuit reversed the district court's dismissal of a first amendment

19   challenge by a group of Spokane firefighters to city officials' application of Proclamation 21-14.

20   104 F.4th at 747.[22] However, this reversal rested entirely on the higher court's finding that the

21   firefighters had plausibly pled that, after they were discharged for not becoming vaccinated, their

22   [21] Plaintiff's attempted argument that "the City allowed other employees [without religious exemptions] to mask . . . but denied [Plaintiff] the same safety measures" is nonsensical. Dkt. No. 24 at 29. These employees used masks *in addition* to vaccination, not instead of it, and Plaintiff was never prevented from masking.

23   [22] On the same day it reversed the district court's dismissal of the *Bacon* plaintiffs' as-applied constitutional claim, the Ninth Circuit issued an unpublished, companion opinion affirming the dismissal of the plaintiffs' other claims, including a facial free exercise challenge to Proclamation 21-14. *Bacon v. Woodward*, 2024 WL 3041850, at *1.

24

roles were filled through contracts with private ambulance services and mutual-aid agreements

with other fire departments. "In other words, Spokane implemented a vaccine policy from which

it exempted certain firefighters based on a secular criterion—being a member of a neighboring

department—while holding firefighters who objected to vaccination on purely religious grounds

to a higher standard." *Id.* at 751. Similarly, in *Cox*, an as-applied challenge to a school district's

policy of not allowing unvaccinated staff to work directly with students survived summary

judgment because the plaintiffs introduced evidence that an individual who received a medical

exemption from vaccination was allowed to work with students, "suggest[ing] that individualized

discretion applied" in the enforcement of the rule, and "[a] jury could also conclude that the

policy was not neutral as applied because it favored those with medical exemptions over those

with religious exemptions." 2024 WL 777598, at *17. But Plaintiff presents no similar evidence

here.

Plaintiff also asserts that "Defendant singled out Plaintiff for continued harassment and

coercive communications meant to force her to comply with the requirement." Dkt. No. 24 at 29.

No evidence is offered in support of this assertion, and the Court is aware of nothing in the

record indicating that Plaintiff was "singled out" or "harassed." Plaintiff's other references to

"coer[cion]" cite only to her own complaint, which is not evidence. *Id.* at 28, 30; *see Hernandez*,

343 F.3d at 1112. At oral argument, Plaintiff's counsel clarified Plaintiff's position that emails

from City officials to all staff encouraging vaccination, as well as letters informing Plaintiff that

she would be terminated if she did not become vaccinated, or that she was being given extra time

to become vaccinated before termination, left Plaintiff feeling that Defendant did not take her

religious beliefs seriously. However, as Defendant points out, "The Free Exercise Clause does

not require the City to remove Dixson from neutral and generally applicable all-City COVID-19-

related emails or prevent the City from updating Dixson regarding her accommodation." Dkt.

No. 32 at 10 n.11. As other courts in this District have found, communications that "merely

reiterate[] the . . . goal of persuading employees to be vaccinated," or those remind them that, if

not vaccinated or accommodated, they will be terminated, neither evince hostility toward religion

nor substantially burden free exercise. *Seagraves v. Dep't of Child. Youth & Fams.*,

No. C24-5081, 2025 WL 1031306, at *5 (W.D. Wash. Apr. 7, 2025), *reconsideration denied*,

2025 WL 1180380 (W.D. Wash. Apr. 23, 2025)*; see also Rolovich v. Washington State Univ.*,

No. C22-319, 2023 WL 3733894, at *6 (E.D. Wash. May 30, 2023)). "[Defendant's] repeated

statements to Plaintiff that his employment would be terminated with just cause for failing to

comply with the vaccination requirements were in accord with the Proclamation" and not

unconstitutionally coercive). The Court further notes that, where an employer acts lawfully in

terminating an employee who does not meet a vaccination requirement (as the Court finds

Defendant did here), the employer must be allowed to inform the employee of the date of their

separation, the reason, and the employee's right to continued employment should their decision

about vaccination change.

Accordingly, the Court finds that Defendant's vaccination policy was neutral and

generally applicable, both facially and as applied.

### b.    Defendant's Vaccination Policy Survives Rational Basis Review

Because Defendant's vaccination policy was both facially neutral and generally

applicable, the incidental burden it imposed on Plaintiff's religious exercise is subject to rational

basis review. *See Stormans*, 794 F.3d at 1084 (citing *Guam v. Guerrero*, 290 F.3d 1210, 1215

(9th Cir. 2002)). "Under rational basis review, we must uphold [policies] if they are rationally

related to a legitimate governmental purpose." *Id.* (citing *Gadda v. State Bar of Cal.*, 511 F.3d

933, 938 (9th Cir. 2007)). Plaintiff has "the burden to negat[e] every conceivable basis which

might support" the policy. *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).

Plaintiff—who argues that strict scrutiny applies—provides no argument that the vaccine requirement fails rational basis review. *See* Dkt. No. 24 at 30. She does not contest that the intent to safeguard individuals from COVID-19 is a legitimate interest—by now a well-established fact of law. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest . . . ."); *Pilz v. Inslee*, No. C22-35508, 2023 WL 8866565, at *2 (9th Cir. Dec. 22, 2023) (same); *Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*, 4 F.4th 747, 758 (9th Cir. 2021) ("There is a legitimate state interest in preventing the spread of COVID-19, a deadly contagious disease."); *Burcham v. City of Los Angeles*, 562 F. Supp. 3d 694, 707 (C.D. Cal. 2022) ("[T]here is no question that the city's interest in preventing the spread of COVID-19 is not merely legitimate, it is 'unquestionably . . . compelling.'" (quoting *Roman Catholic Diocese*, 592 U.S. at 18)); *Gunter v. N. Wasco Cnty. Sch. Dist. Bd. of Educ.*, 577 F. Supp. 3d 1141, 1158 (D. Or. 2021) (finding that school board had legitimate interest in preventing the spread of COVID-19); *Altman v. Cnty. of Santa Clara*, 464 F. Supp. 3d 1106, 1128 (N.D. Cal. 2020) ("Plaintiffs concede that 'Defendants have a legitimate interest in reducing the population's exposure to COVID-19,' a pandemic that is 'serious in nature.'"); *see also Does 1-6 v. Mills*, 16 F.4th 20, 32 (1st Cir. 2021) ("Few interests are more compelling than protecting public health against a deadly virus."); *Norris v. Stanley*, 73 F.4th 431, 436 (6th Cir. 2023) ("Public health and safety easily fall within the state's legitimate interests.").

Nor does Plaintiff deny that the vaccination policy is rationally related to Defendant's interest in protecting its employees and the public from the transmission of COVID-19. *See*, *e.g.*, Dkt. No. 20 at 10 ("Plaintiff does not contest that the vaccines were developed to and tested to

prevent serious illness and death; nor does she challenge [Defendant]'s right to implement a vaccine mandate."). In fact, Plaintiff appears to concede in at least one filing currently before the Court that vaccination is the most effective way to accomplish this goal. *See* Dkt. No. 33 at 9 ("Second, vaccination being the 'best means,' again, Plaintiff has stated she is not contesting this fact . . . ."). Courts in this District and beyond have overwhelmingly found that "requiring employees to be vaccinated against COVID-19 is rationally related to interest in safeguarding employee and public health and preventing the spread of COVID-19." *Moriarty*, 2024 WL 4290279, at *7; *see also*, *e.g.*, Dkt. No. 34 (Supplemental Authority: Order granting motion to dismiss in *Zimmerman v. Port of Seattle*, No. C25-624 (W.D. Wash. June 26, 2025)) at 17–18, *Chavez v. San Francisco Bay Area Rapid Transit Dist.*, 723 F. Supp. 3d 805, 818 (N.D. Cal. 2024) ("[R]equiring employees to be vaccinated is rationally related to that interest because data show that approved COVID-19 vaccines drastically reduce the chances of contracting and spreading the virus." (quoting *UnifySCC*, 2022 WL 2357068, at *8)); *Pilz*, 2023 WL 8866565, at *2 ("Because requiring vaccination of state agency and healthcare workers is rationally related to [the goal of stemming the spread of COVID-19], the Proclamation survives Plaintiffs' constitutional challenge."); *George,* 2022 WL 16722357, at *16 ("vaccine mandates are a rational method to reduce COVID-19 infection and the risk of serious illness, hospitalization, and death related thereto"); *Johnson v. Brown*, 567 F. Supp. 3d 1230, 1252 (D. Or. 2021) ("The Vaccine Orders are rationally related to Defendants' interests in slowing the spread of COVID-19, protecting Oregon's citizens, protecting children and teachers in schools, and preserving healthcare resources and protecting patients."); *Wise v. Inslee*, No. C21-288, 2021 WL 4951571, at *3 (E.D. Wash. Apr. 27, 2022) ("The Proclamation is rationally related to that interest because it is based on overwhelming evidence that the vaccines are safe and effective, and increasing vaccination rates among those employees who come into regular contact with

vulnerable populations (e.g., those who are immunocompromised, who cannot get vaccinated—like children under age 12, and those who must interact with public employees—like prisoners) is a rational action to reduce the spread of COVID-19."); *see also Spivack v. City of Philadelphia*, 109 F.4th 158, 178 (3d Cir. 2024) (finding vaccine mandate "rationally related to those objectives because [it] ensure[s] that a greater proportion of the office is vaccinated and therefore less likely to contract and spread the virus, experience severe illness, or miss work."); *Norris*, 73 F.4th at 436 ("Instead, to pass rational basis review, it is sufficient that MSU could rationally believe that requiring the vaccine for naturally immune individuals would further combat COVID-19 on its campus.").

Like other policies that have survived rational basis review, the City of Issaquah's vaccine mandate for City employees was intended to slow the spread of COVID-19 and safeguard the health of City employees and the public. Dkt. No. 15 at 2 ¶¶ 7–8; Dkt. No. 15 at 23. "Stemming the spread of COVID–19 is unquestionably a compelling interest . . . ." *Roman Catholic Diocese*, 592 U.S. at 18. The policy is rationally related to these interests "because it is based on overwhelming evidence that the vaccines are safe and effective, and increasing vaccination rates among those employees who come into regular contact with vulnerable populations . . . is a rational action to reduce the spread of COVID-19." *Wise*, 2021 WL 4951571, at *3; *see* Dkt. No. 15 at 2 ¶ 7; Dkt. No. 16 at 31 ¶ 72.

Accordingly, the Court GRANTS summary judgment in favor of Defendant on Plaintiff's free exercise claim.

### 4.    Claim Four: Wrongful Discharge in Violation of Public Policy

In her final cause of action, Plaintiff alleges wrongful discharge in violation of public policy, citing RCW 49.60.030(1) and 49.60.180(2). Dkt. No. 1-2 ¶ 112.

The tort for wrongful discharge (or termination) in violation of public policy emerged in Washington common law as a "narrow public policy exception" to the doctrine that indefinite employment contracts are terminable at will. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984). However, it has since been expanded to apply to both at-will employees and those who can only be terminated for cause, *Smith v. Bates Tech. Coll.*, 139 Wash. 2d 793, 807, 991 P.2d 1135 (2000). The tort "generally applies in four specific scenarios: (1) where employees are fired for refusing to commit an illegal act, (2) where employees are fired for performing a public duty or obligation, (3) where employees are fired for exercising a legal right or privilege, and (4) where employees are fired in retaliation for reporting employer misconduct." *Suarez*, 3 Wn.3d at 430 (citing *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989)). Where one of these scenarios neatly applies,[23] "a plaintiff employee must demonstrate that his or her 'discharge may have been motivated by reasons that contravene a clear mandate of public policy.' Then, 'the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee.'" *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723, 425 P.3d 837 (2018) (internal citation omitted) (quoting *Thompson*, 102 Wn.2d at 232–33).

Plaintiff positions her claim as being of the third type under *Thompson*: she alleges she "exercised a legal right and/or privilege under Washington Law Against Discrimination, RCW §49.60 in requesting a religious accommodation from the city's vaccination policy," and

---

[23] If the claim does not fit neatly with the four specific scenarios, then Court applies the four-factor "Perritt framework." *See Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996) (explaining law professor Henry H. Perritt Jr.'s comprehensive test for analyzing wrongful discharge claims). But a Perritt analysis is not necessary here. *Cf. Adams v. Confluence Health*, 30 Wn.App. 2d 1010, *2 (unpublished) (Where unvaccinated healthcare workers alleged they were terminated for exercising a legal right or privilege, Perritt analysis was necessary because "Proclamation 21-14.1 expressly criminalized the continued presence of unvaccinated health care workers in clinical settings. Thus, violating the proclamation was not exercising a legal right or privilege."), *review denied*, 3 Wn.3d 1015, 554 P.3d 1225 (2024).

1    Defendant eventually terminated her "because of her inability to become vaccinated due to her

2    sincerely held religious beliefs." Dkt. No. 1-2 ¶¶ 113, 115.

3        Plaintiff does not consistently identify which "legal right or privilege" she was allegedly

4    fired for exercising, alleging in turn that she was discharged "because of [her] creed" (*id.* ¶ 112),

5    that she "exercised a legal right and/or privilege . . . in requesting a religious accommodation"

6    (*id.* at 113), and that she was "terminated . . . because of her inability to become vaccinated due

7    to her sincerely held religious beliefs" (*id.* at ¶ 115). To the extent Plaintiff alleges she was

8    terminated for her Christian faith or her particular beliefs, she has not provided facts in support

9    of that assertion. Nor do the facts support Plaintiff's allegation that she was fired for

10   "exercise[ing her] legal right and/or privilege [to] request[] a religious accommodation." Dkt.

11   No. 1-2 ¶113.[24] Plaintiff was terminated because Defendant required COVID-19 vaccination as a

12   condition of employment, Plaintiff was not vaccinated, and the City found that her unvaccinated

13   status could not be accommodated without undue hardship. While Plaintiff's decisions to request

14   an accommodation and remain unvaccinated both stem from the same belief and are clearly

15   related, they are not the same, and it is the second, not the first, that provided a basis for

16   Plaintiff's termination.[25]

17   //

18   //

---

19   [24] Undisputed facts show that after Plaintiff exercised her right to request an accommodation, she was provided with
     many opportunities to avoid termination. Plaintiff was clearly informed, for months before her termination, that she

20   would be terminated if she did not become vaccinated, and that she would not be terminated if she changed her mind
     and received the vaccine. *See* Dkt. No. 15 at 45–46. Plaintiff does not present any evidence (and does not allege)
     that these statements by Defendant's agents were untruthful and, in fact, dedicates the majority of her response on

21   this claim to examples of Defendant's agents encouraging (or "pressuring") her to become vaccinated and keep her
     job. Dkt. No. 24 at 30. But these examples prove that, had she chosen to be vaccinated, Plaintiff could have

22   remained employed *even though* she had requested an exemption and *even if* her religious beliefs did not change—
     that is, she was not terminated for the request she made, or the beliefs she held.

23   [25] A simple counterfactual shows this to be true. Had Plaintiff requested a religious accommodation, but ultimately
     decided to become vaccinated before the deadline, she would not have been terminated under the City's policy. Had

24   she remained unvaccinated but never requested a religious accommodation, she would have been terminated under
     the policy.

Accordingly, to sustain her wrongful discharge claim, Plaintiff must show that the city's action in terminating her for exercising her right to refuse vaccination "may have been motivated by reasons that contravene a clear mandate of public policy." Neither the law nor the facts can sustain this claim. First, in this and other contexts, courts have repeatedly held that there is no legal right to refuse vaccination *and remain employed. See, e.g., Brock v. City of Bellingham*, No. C24-850, 2025 WL 254725, at *14 (W.D. Wash. Jan. 21, 2025) (dismissing Washington wrongful termination claim based on allegation of exercising right to refuse unwanted medical treatment, finding plaintiffs were not exercising a legal right or privilege); *Kheriaty v. Regents of the Univ. of Cal.*, No. 22-55001, 2022 WL 17175070, at *1 (9th Cir. Nov. 23, 2022) (no "fundamental right" to be free from a vaccine mandate in a workplace); *Boysen v. PeaceHealth*, 2024 WL 3888682, at *9 (D. Or. Aug. 19, 2024) (same). Second, Plaintiff has not provided support for an argument that terminating employees who do not become vaccinated when required to do so violates any clear mandate of public policy. Plaintiff alleges that her discharge "was in violation of a clear mandate of public policy that employers accommodate the religious beliefs of employees unless doing so is an undue hardship" Dkt. No. 1-2 at ¶ 114. "In a wrongful termination in violation of public policy claim, specifically under RCW 49.60.180(2) and RCW 49.60.030(1)"—as pleaded by Plaintiff here (*see* Dkt. No. 1-2 at 23)—"one is alleging that the employer violated a prohibition of a specific act, a negative mandate on employers forbidding them from terminating an employee based on their religious beliefs" (or failing to accommodate those beliefs). *Suarez*, 3 Wn.3d at 431–32. In other words, to prevail, the Plaintiff must demonstrate "that her termination was a direct statutory violation" of the WLAD, and she has not done so. *Id.* at 432. As the Court has already explained, Plaintiff has not produced evidence to sustain her WLAD claim. *See supra* Section III.C.1.b.(2)(ii). Additionally, Plaintiff has not shown—or even alleged (*see* Dkt. No. 1-2 ¶¶ 112–16, Dkt. No. 24 at 30)—that her

termination "may have been *motivated* by reasons that contravene a clear mandate of public policy." *Thompson*, 102 Wn.2d at 232 (emphasis added). In fact, the primary motivation for Plaintiff's termination—to protect public safety and stem the spread of COVID-19, *see supra* Sections I.D., III.C.1.b.(1)(i)—is consistent with the clear statement of public policy outlined in Proclamation 21-14.1, which the Washington Supreme Court has upheld. *See In re Recall of Inslee*, 199 Wn.2d 416, 434, 508 P.3d 635 (2022).

Accordingly, the Court GRANTS summary judgment in favor of Defendant on Plaintiff's claim for wrongful discharge in violation of public policy.

### IV.    CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Dkt. No. 14) is GRANTED, and Plaintiff's claims are DISMISSED with prejudice. Defendant's motion to exclude Plaintiff's expert (Dkt. No. 19) is DENIED as moot.

Dated this 25th day of September, 2025.

Tana Lin
United States District Judge